**NATIONAL WRESTLING COACHES ASSOCIATION et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF EDUCATION, Defendant.**

**No. CIV.02–0072 EGS.**

United States District Court, District of Columbia.

June 11, 2003.

Lawrence J. Joseph, Esq., Robert A. Matthews, Esq., McKenna Long & Aldridge LLP, Washington, DC, Counsel for Plaintiffs.

Joseph W. LoBue, Esq., Sheila Lieber, Esq., U.S. Department of Justice, Laurie J. Weinstein, United States Attorney's Office, Washington, DC, Counsel for Defendant.

Marcia D. Greenberger, Esq., Dina R. Lassow, Esq., Neena K. Chaudhry, Esq., Kathleen A. Behan, Esq., Michael C. Augustini, Esq., Ellen W. Woodward, Esq., Lynn Y. Tran, Esq., Arnold & Porter,

Washington, DC, Counsel for amicus National Women's Law Center et al.

Theodore Voorhees, Jr, Esq., Timothy J. Keefer, Esq., Covington & Burling, Washington, DC, Counsel for amicus Independent Women's Forum.

## MEMORANDUM OPINION

SULLIVAN, District Judge.

## I. Introduction

Plaintiffs, National Wrestling Coaches Association ("NWCA"), Committee to Save Bucknell Wrestling ("CSBW"), Marquette Wrestling Club ("MWC"), Yale Wrestling Association ("YWA"), and College Sports Council ("CSC") are associations representing male intercollegiate and scholastic athletes, coaches, and alumni. They commenced this action for declaratory judgment and injunctive relief to enjoin the U.S. Department of Education ("DoE") from enforcing Title IX, which prohibits sex discrimination in education, in a manner they contend results in discrimination against male athletes. Specifically, plaintiffs maintain that the Department's current enforcement policies lead educational institutions to cut men's sports teams, artificially limit the number of participants on men's teams, and otherwise impermissibly discriminate against men based on sex in the provision of athletic opportunities, thereby denying male athletes and other interested parties the equal protection of laws.

Accordingly, plaintiffs, on behalf of their members, challenge the agency's "1979 Policy Interpretation" and "1996 Clarification," pursuant to which Title IX and its regulations are currently enforced. Plaintiffs contend that both of these policy statements violate the Equal Protection component of the Due Process Clause of the Fifth Amendment, and exceed the agency's regulatory authority under the statute by requiring the very discrimination the statute prohibits. Moreover, plaintiffs allege that the 1996 "Clarification" effectively amended the substantive provisions of the 1975 Title IX regulations under the guise of interpretation and clarification without formal rulemaking, thus violating the Administrative Procedure Act (APA). Plaintiffs also maintain that procedural infirmities in promulgation of both the 1979 Policy Interpretation and the 1996 Clarification render both documents null and void.

Plaintiffs seek declaratory and injunctive relief vacating the 1996 Clarification and the 1979 Policy Interpretation, compelling the Department of Education to conduct formal notice and comment rulemaking "consistent with Title IX, the U.S. Constitution, and this Court's declaratory relief in this action," and staying all "disparate-impact components" of Title IX regulations until a new final rule is promulgated.

Currently pending before this Court are defendant's motion to dismiss and plaintiffs' opposed motion for leave to file a second amended complaint.

Upon careful consideration of the motions, the responses and replies thereto, the oral arguments of counsel, the entire record herein, as well as the governing statutory and case law, and for the following reasons, it is by the Court hereby

**ORDERED** that the plaintiffs' motion for leave to file a second amended complaint is hereby **DENIED;** and it is

**FURTHER ORDERED** that the defendant's motion to dismiss is hereby **GRANTED.**

### A. Parties

NWCA is a not-for-profit corporation representing the interests of collegiate and

scholastic wrestling coaches. First Am. Compl. ¶ 4.

CSBW is an unincorporated not-for-profit association of student-athletes attending Bucknell University in Lewisburg, PA, as well as Bucknell University alumni, formed to advocate for maintenance or reinstatement of Bucknell University's intercollegiate wrestling program. *Id.* ¶ 5. Its members include students who competed on the university's 2001–2002 men's wrestling team. *Id.*

MWC is an unincorporated not-for-profit association of student-athletes attending Marquette University in Milwaukee, WI, along with alumni of the University, formed to raise funds to support Marquette's men's wrestling program. *Id.* ¶ 6.

YWA is an unincorporated not-for-profit association, formed to provide financial support to the men's wrestling program at Yale University in New Haven, CT, and to seek reinstatement of men's wrestling as an intercollegiate varsity sport at the University. *Id.* ¶ 7.

CSC is a not-for-profit District of Columbia corporation which serves as an umbrella organization for groups representing the interests of collegiate coaches and athletes, and includes among its members the national collegiate coaches' associations for men's and women's swimming, track and field, wrestling, and men's gymnastics. *Id.* ¶ 8.

Defendant DoE, is the federal agency responsible for implementation and enforcement of Title IX, 20 U.S.C. § 1681–1688, the federal statute prohibiting discrimination based on sex in educational programs and activities receiving federal financial assistance.

The National Women's Law Center ("NWLC"), American Volleyball Coaches Association, International Women's Lacrosse Coaches Association, National Fast-pitch Softball Coaches Association, Women's Basketball Coaches Association, American Association of University Women, and Women's Sports Foundation, moved for and were granted permission to participate as *amici curiae* in this case. All are organizations asserting an interest in the achievement of equal opportunities for women and girls in athletics, and filed briefs in support of defendant's motion to dismiss.

Also participating as *amicus curiae* is the Independent Women's Forum ("IWF"), a nonprofit organization advocating for "individual liberty and responsibility, self-governance, the superiority of the market economy, and ... equal opportunity for all." IWF joins plaintiffs in opposing defendant's motion to dismiss, principally advancing arguments on the merits of plaintiffs' claims.

## B. Procedural History

DoE filed a motion to dismiss plaintiffs' claims for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), on the grounds that plaintiffs lack standing to bring their claims under Article III of the U.S. Constitution, and that their action is barred on sovereign immunity and statute of limitations grounds.

Plaintiffs cross-moved for summary judgment in their response to the defendant's motion to dismiss. However, by Order dated July 25, 2002, proceedings on plaintiffs' motion for summary judgment were stayed until the question of subject matter jurisdiction was resolved.

The Court heard oral argument on defendant's motion to dismiss on October 15, 2002. Presumably in an effort to correct the jurisdictional defects alleged by defendant, plaintiffs moved for leave to file a Second Amended Complaint. On January 16, 2003, plaintiffs filed a "Notice of Peti-

tion," advising the Court that plaintiff CSC had petitioned the Secretary of Education, pursuant to 5 U.S.C. § 553(e) of the APA,[1] seeking repeal of the 1979 Policy Interpretation and 1996 Clarification.

## II. Statutory and Regulatory Framework

In light of the complexity of the regulatory scheme through which Title IX has been implemented and enforced over the past 30 years, as well as the significance of the statute's substantive and procedural history to plaintiffs' claims, the Court will first engage in a comprehensive review of the Title IX statutory and regulatory framework before directly addressing plaintiffs' claims.

### A. Title IX

Title IX was enacted as part of the Education Amendments of 1972, following extensive hearings on discrimination in education, during which over 1200 pages of testimony were gathered, documenting "massive, persistent patterns of discrimination against women" in colleges and universities. Pub.L. No. 92–318, §§ 901–905, 86 Stat. 373–75 (1972); 118 Cong. Rec. 5804 (daily ed. Feb. 28, 1972) (statement of Sen. Bayh). The objectives of the statute are two-fold: "to avoid the use of federal resources to support discriminatory practices," and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979). Section 901 of Title IX, which is patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits discrimination based on sex in federally funded educational programs and activities. Pub.L. No. 92–318,

§ 901, codified at 20 U.S.C. § 1681 (2003); 118 Cong. Rec. 5802, 5803, 5807 (daily edition Feb. 28, 1972) (statement of Sen. Bayh); *N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 514, 529, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). It provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681. The statute expressly precludes a finding of discrimination based solely on statistical evidence of gender disparities in athletic programs:

> Nothing contained in . . . this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federal program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area.

*Id.; Cohen v. Brown Univ.,* 991 F.2d 888, 894–95 (1st Cir.1993) [hereinafter "Cohen I"]. This statutory language does not, however, preclude any consideration of statistical disparities in the adjudication of a Title IX claim, as evidenced by the *proviso* immediately following:

> *Provided,* That this subsection shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such imbalance exists with respect to participation in, or

---

1. The APA provides, in relevant part, that "each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. 553(e) (2003).

receipt of benefits of, any such program or activity by members of one sex.

20 U.S.C. § 1681.

Federal agencies, such as DoE, providing financial assistance to educational programs or activities are authorized and directed to effectuate the provisions of Section 1681 by

> issuing rules, regulations, or orders of general applicability which shall be consistent with the achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President.

20 U.S.C. § 1682 (2003).

The "ultimate sanction" for non-compliance with the statute is termination of federal funding or denial of future federal grants.[2] *Id., North Haven Bd. of Educ. v. Bell,* 456 U.S. at 514, 102 S.Ct. 1912. The statute expressly enables "any person aggrieved" by an agency's termination of funding based on a finding of non-compliance with the statute to seek judicial review of such agency action. 20 U.S.C. § 1683 (2003). Further, "private lawsuits have played an important role in Title IX enforcement." *Gender Equity: Men's and Women's Participation in Higher Education,* General Accounting Office, GAO 01–128 at 5 (December 2000) [hereinafter "GAO Report"]; *Cannon v. Univ. of Chicago,* 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (recognizing implied private right of action to enforce Title IX).

## B. 1975 Regulations

Two years after Title IX was passed, Congress enacted the Education Amendments of 1974, directing the Secretary of Health, Education, and Welfare ("HEW"), DoE's predecessor agency, to promulgate regulations implementing Title IX, which were to "include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub.L. No. 93–380, § 844, 88 Stat. 484, 612 (1974).

In 1975 HEW published final Title IX regulations ("1975 Regulations"), which remain in effect. 40 Fed.Reg. 24,128 (June 4, 1975); codified at 45 C.F.R. §§ 86.1–86.71 (2003). Promulgation of the final regulations followed a four month period during which over 9,700 public comments regarding proposed regulations published in the Federal Register on June 20, 1974 were accepted and considered. *Id.* The regulatory provision specifically addressing federally funded athletic programs provides, in relevant part:

> A recipient ... shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available, the Director will consider, among other factors:

2. Congress expressed a strong preference for voluntary compliance with Title IX, as evidenced by the following language in 20 U.S.C. § 1682:

> No such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

Consistent with this statutory preference, DoE "has not terminated its funding for any post-secondary institution for violation of title IX," but rather has secured compliance through "complaint investigations, compliance reviews, and the issuance of policy guidance." *Gender Equity: Men's and Women's Participation in Higher Education,* General Accounting Office, GAO 01–128 at 5 (December 2000) ("GAO Report"). The agency's "approach to enforcement emphasizes collaboration and negotiation." *Id.*

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes . . .

45 C.F.R. § 86.41(c). This section lists nine additional factors an agency may consider when determining whether a funded entity is complying with the regulations by making equal opportunities available in athletics. *Id.* These factors include provision of equipment and supplies, as well as physical, coaching, medical, training, housing and dining facilities and services, scheduling of games and practice times, travel and *per diem* allowances, opportunity to receive academic tutoring, and publicity. *Id.* The regulations also provided for a three year "adjustment period" from the date of promulgation to allow affected educational institutions to come into compliance. 45 C.F.R. § 86.41(d). The 1975 HEW Regulations were approved by President Gerald Ford on May 27, 1975. 40 Fed.Reg. 24,137 (June 4, 1975).

### C. 1979 Policy Interpretation

Several months after the expiration of the three year "adjustment period," HEW issued a proposed policy interpretation to, *inter alia,* further explain the concept of "equal athletic opportunity" embodied in the 1975 Regulations and "provide further guidance on what constitutes compliance with the law." 43 Fed.Reg. 58,070 (Dec. 11, 1978); *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics,* 44 Fed.Reg. 71,413 (December 11, 1979) [hereinafter "1979 Policy Interpretation"]. After accepting over 700 comments from the public and visiting eight universities to determine how the proposed policy and suggested alternatives would apply in actual practice, the agency promulgated a final policy, dubbed the "1979 Policy Interpretation." 44 Fed.Reg. 71,413.

The proposed Policy Interpretation noted that HEW had, at that time, "received 93 complaints alleging that more than 62 institutions of higher education were not providing equal athletic opportunities for women." 43 Fed.Reg. at 58,071. The purpose of the final 1979 Policy Interpretation was described as follows:

> this Policy Interpretation explains the regulation so as to provide a framework within which the complaints can be resolved, and to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs.
>
> . . .
>
> The final Policy Interpretation clarifies the meaning of "equal opportunity" in intercollegiate athletics. It explains the factors and standards set out in the law and regulation which the Department will consider in determining whether an institution's intercollegiate athletics program complies with the law and regulations. It also provides guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory.

44 Fed.Reg. 71,413, 71,414.[3]

The 1979 Policy Interpretation emphasizes that, although it "does not contain a

---

**3.** The 1979 Policy Interpretation sets forth three general areas in which Title IX is applied to athletic programs: scholarships, equivalent treatment, and equivalent accommodation. 44 Fed.Reg. 71,415, 71,417. A Title IX violation "may be shown by proof of a substantial violation in *any one* of the three major areas of investigation set out in the Policy Interpretation." *Pederson v. La. State Univ.,* 213 F.3d 858, 879 (5th Cir.2000) (citation omitted); *see also Boulahanis v. Bd. of Regents,* 198 F.3d 633, 635 (7th Cir.1999) ("'an 'institution may violate Title IX solely by failing to accommodate the interests of both

separate section on institutions' future responsibilities[,] ... institutions remain obligated by the Title IX regulation to accommodate effectively the interests and abilities of male and female students with regard to the selection of sports and levels of competition available." 44 Fed.Reg. 71,414. This language has been interpreted as indicating that the 1979 Policy Interpretation was designed to assist institutions in "self-policing" their compliance with Title IX. *See, e.g. Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 612 (6th Cir.2002); *Kelley v. Bd. of Trustees, Univ. of Ill.*, 35 F.3d 265, 268 (7th Cir.1994). Significantly, the 1979 Policy Interpretation concludes that, "[i]n most cases, this will entail development of athletic programs that *substantially expand opportunities for women* to participate and compete at all levels." *Id.* (emphasis added).

Finally, the 1979 Policy Interpretation is "designed specifically for intercollegiate athletics," but emphasizes that "its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by the regulation." 44 Fed.Reg. 71,413.

The 1979 Policy Interpretation states that, with respect to the first of the ten factors identified in the 1975 Regulations as determinative of whether an institution is providing "equal opportunity" in its athletic program, i.e. "whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes," 45 C.F.R. § 86.41(c)(1), recodified at 34 C.F.R. § 106.41(c)(1) (2003), the agency will conduct an "Overall Determination of Compliance," during which it will ascertain

(a) whether an institution's policies are discriminatory in language or effect;

(b) whether the institution's program as a whole includes substantial and unjustified disparities in the opportunities or treatment afforded to male and female athletes; and

(c) whether segments of the institution's program include disparities in the treatment and opportunities that are substantial enough to deny equality of athletic opportunity.

44 Fed.Reg. 71,418. Moreover, the agency will assess compliance with the "interests and abilities" factor of the ten-factor equal opportunity test by examining:

a. The determination of athletic interests and abilities of students;

b. The selection of sports offered; and

c. The levels of competition available including the opportunity for team competition.

44 Fed.Reg. 74,417.

In order to assess students' athletic interests and abilities, the 1979 Policy Interpretation permits institutions to use "any non-discriminatory method," provided that:

(a) the process takes into account the nationally increasing levels of women's interests and abilities;

(b) the methods do not disadvantage the members of the underrepresented gender;

(c) the methods of determining ability consider team performance records; and

(d) the methods are responsive to the expressed interests of the students of the underrepresented gender capable of intercollegiate competition.

44 Fed.Reg. 71,417.

With respect to the selection of sports offered, "the regulation does not require

---

sexes.' ") (citations omitted). Plaintiffs' challenge, and therefore this opinion, focuses on the third general area of inquiry set forth in

the 1979 Policy Interpretation, equivalent accommodation.

institutions to integrate their teams nor to provide exactly the same choice of sports to men and women." 44 Fed.Reg. 71,417–18. Rather, the 1979 Policy Interpretation sets forth a framework for effective accommodation of student interests when selecting athletic offerings within contact sports and non-contact sports. *Id.*

The examination of the third criterion, "levels of competition available, including the opportunity for team competition," under the 1979 Interpretation is informed by the agency's view that:

> In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.

44 Fed.Reg. 74,418. According to the 1979 Policy Interpretation, compliance with this directive is achieved by demonstrating one of the following, under what has become known as the "Three Part Test":

> (1) ...intercollegiate level participation opportunities for male and female athletes are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes ... the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above,... it can be demonstrated that the interests and abilities of the members of that sex have

been fully and effectively accommodated by the present program.

*Id.* [hereinafter "Three Part Test"].

### D. Department of Education Organization Act

The Department of Education Organization Act of 1979 divided the former HEW into two new agencies: DoE and the Department of Health and Human Services. Pub.L. No. 96–88, 93 Stat. 669, 671 (1979); 20 U.S.C. § 3411 (2003); E.O. 12212, 45 Fed.Reg. 29557 (May 2, 1980). In so doing, it provided that, "in carrying out any function transferred by this Act, the Secretary, or any officer or employee of the Department, may exercise any authority available by law ... to the official or agency from which such function was transferred ...." 20 U.S.C. § 3471(a) (2003); *see also* 20 U.S.C. § 3507 (2003)(references in other statutes to the functions or officials of HEW "shall be deemed to refer to the Secretary, official, or other component of the Department to which this Act transfers such functions."). The Act also expressly stipulated that

> "[a]ll orders, determinations, rules, [and] regulations ... issued ... or allowed to become effective by the President [or] any Federal department or agency or official thereof, ... in the performance of functions, which are transferred under this Act to the Secretary or the Department, and ... which are in effect at the time this Act takes effect, shall continue in effect according to their terms until modified, terminated, superseded, set aside or revoked in accordance with the law by the President, the Secretary, or other authorized official ...."

20 U.S.C. § 3505(a) (2003).

Accordingly, DoE promulgated a rule recodifying under a new Title 34 of the Code of Federal Regulations those HEW

regulations which were transferred to DoE. 45 Fed.Reg. 30,802 (May 9, 1980). The 1975 Regulations implementing Title IX were recodified without substantial change at 34 C.F.R. § 106.41 (2003).[4]

### E. 1996 Clarification

On May 9, 1995, the House Subcommittee on Postsecondary Education, Training and Life-long Learning of the Economic and Educational Opportunities Committee held a hearing on Title IX and the Three Part Test. On June 7, 1995, 142 Members of Congress wrote the Assistant Secretary for Civil Rights for DoE, the Honorable Norma V. Cantú, expressing concern that educational institutions were complying with the Three–Part Test by eliminating men's athletic opportunities to achieve "substantial proportionality" of opportunity under the first prong of the Three Part Test rather than by increasing women's athletic opportunities.

In response to "requests for specific guidance about existing standards that have guided the enforcement of Title IX in the area of intercollegiate athletics," DoE subsequently sent a proposed "clarification" of the 1979 Policy Interpretation to over 4,500 interested parties as an enclosure to a letter from Ms. Cantú addressed "Dear Colleague." *Clarification of Intercollegiate Athletics Policy Guidance: the Three–Part Test* (Sep. 20, 1995) (*transmitted by* Letter from Norma V. Cantú, Assistant Sec'y, Office for Civil Rights, Department of Education (Sep. 20, 1995)); *Clarification of Intercollegiate Athletics Policy Guidance: the Three–Part Test* (Jan. 16, 1996) (*transmitted by* Letter from Norma V. Cantú, Assistant Sec'y, Office for Civil Rights, Department of Education). A Notice in the Federal Register announced the availability of the draft clarification. 60 Fed.Reg. 51,460 (Oct. 2, 1995). The letter transmitting the proposed Clarification explicitly emphasized that, by issuing the requested "guidance," DoE was "not revisiting the Title IX regulation or the Title IX Policy Interpretation." *Clarification of Intercollegiate Athletics Policy Guidance: the Three–Part Test* (Sep. 20, 1995) (*transmitted by* Letter from Norma V. Cantú, Assistant Sec'y, Office for Civil Rights, Department of Education (Sep. 20, 1995)). Public comment was solicited only with respect to the narrow question of "whether it provides the appropriate clarity in areas that have generated questions." *Id.* The letter of transmittal also emphasized that the Clarification focused on the Three Part Test, which it described as "a test used to determine whether students of both sexes are provided nondiscriminatory opportunities to participate in athletics." *Id.*

After review of over 200 public comments on the 1995 Draft Clarification, DoE released a final version of the Clarification on January 16, 1996. *Clarification of Intercollegiate Athletics Policy Guidance: the Three–Part Test* (Jan. 16, 1996) (*transmitted by* Letter from Letter from Norma V. Cantú, Assistant Sec'y, Office for Civil Rights, Dep't of Educ.) [hereinafter "1996 Clarification"]. DoE's Office for Civil Rights recognized that it had received comments suggesting that the Clarification, as well as the Three Part Test it addressed, were substantively flawed, but reiterated that it had only requested comments regarding whether the document provided necessary clarity, and that "it would not be appropriate to revise the 1979 Policy Interpretation." *Id.*

The final 1996 Clarification "provides specific factors that guide an analysis of

---

**4.** The regulations promulgated by the former HEW remain in effect, under the oversight of the Department of Health and Human Services ("HHS"). *See* 45 C.F.R. § 86.41.

each part of the three-part test. In addition, it provides examples to demonstrate, in concrete terms, how these factors will be considered." *Id.* Certain provisions of the 1996 Clarification are of particular importance to the issues raised by this litigation. For instance, the 1996 Clarification emphasizes that the "Three–Part Test" provides an institution with "three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics. If an institution has met any part of the three-part test, [DoE's Office of Civil Rights] will determine that the institution is meeting this requirement." *Id.* at 2. It goes on to underscore that the requirement addressed by the "Three–Part Test," the provision of nondiscriminatory participation opportunities, is only one of many factors considered under the 1975 Regulations to determine if an institution is in compliance with the intercollegiate athletics provision of Title IX. *Id.* Other factors considered under the 1975 Regulations and the 1979 Policy Interpretation include, *inter alia*, the quality of competition offered, as well as coaching, equipment, facilities, recruitment, and scheduling. *Id.*

Of particular concern to plaintiffs is language used in the 1996 Clarification describing the first prong of the Three Part Test as a "safe harbor." The letter of transmittal accompanying the final version of the 1996 Clarification states

> The first part of the test—substantial proportionality—focuses on the participation rates of men and women at an institution and affords an institution a "safe harbor" for establishing that it provides nondiscriminatory participation opportunities.

Letter from Norma .V. Cantú, Assistant Sec'y, Office for Civil Rights, Dep't of Educ. (Jan. 16, 1996) at 2. It immediately goes on to say that, if an institution does not meet the first prong of the Three Part Test, it "may comply with Title IX by satisfying either part two or part three of the test." *Id.* The words "safe harbor" do not appear anywhere in the language of the final 1996 Clarification itself.

Plaintiffs also emphasize that the 1996 Clarification does not prevent the practice of "capping" (limiting the number of participants on a team) or eliminating men's teams as part of a funded entity's overall efforts at compliance. Specifically, the letter of transmittal states:

> The rules here are straightforward. An institution can choose to eliminate or cap teams as a way of complying with part one of the three-part test. However, nothing in the Clarification requires that an institution cap or eliminate participation opportunities for men ... Ultimately, Title IX provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities.

Letter from Norma V. Cantú, Assistant Sec'y, Office for Civil Rights, Dep't of Educ. (Jan. 16, 1996) at 4.

Finally, citing to the language of the 1979 Policy Interpretation, the 1996 Clarification outlines the manner in which the number of "participation opportunities" for each sex is determined for purposes of the first part of the "Three–Part Test," making it clear that the number of actual athletes on a team, as opposed to the number of slots available on a team, is used. *Id.* at 3 (citing 44 Fed.Reg. at 71,-415).

## F. Intervening History

It is undisputed that Title IX, as enforced by HEW and subsequently by DoE, has had a tremendous impact on women's opportunities in intercollegiate athletics,

and thus has enabled women to reap the myriad benefits of participation in athletic programs.[5] The General Accounting Office reports that the number of women participating in intercollegiate sports grew from 30,000 in 1972 to 157,000 in the 1997–98 school year. *Id.* at 5. Over the same time period, men's overall participation dropped only slightly, from 248,000 to 234,000. *Id.* Much, however, remains to be done in order to achieve substantial equality and eliminate continuing systemic discrimination. Although during the 1998–1999 school year, NCAA member schools spent more money on athletic scholarships for women than for men, they spent more money on average per male intercollegiate sports participant in terms of recruiting, coaching, and operations. *Id.* For instance, although women represent 53% of undergraduates at Division I schools, they are afforded only 41% of available athletic participation opportunities, 36% of athletic operating budgets, and 32% of recruiting dollars. Brief of *Amici Curiae* National Women's Law Center, *et al.* [hereinafter "NWLC Brief"] at 13–14 (quoting *NCAA 1999–2000 Gender Equity Report* (2002) at 20). Moreover, women's overall participation in intercollegiate sports remains below pre-Title IX male participation. *Id.* at 14.

Although Title IX's application to collegiate athletic programs which do not receive direct financial assistance from the federal government was once in question, *see Grove City Coll. v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984), the Civil Rights Restoration Act of 1987 firmly re-established institution-wide coverage, making it crystal clear that Title IX applies to athletic programs operated by any school receiving federal funding for any of its educational programs and activities, and not just to those athletic programs which directly received federal dollars. Pub.L. No. 100–259, 102 Stat. 28 (1988). In so doing, Congress re-emphasized the importance of Title IX as a tool for creating a more level playing field for women. *See, e.g.,* 130 Cong. Rec. $12,642 (daily ed. Oct. 2, 1984) (statement of Sen. Byrd) (highlighting past discrimination against women athletes); 130 Cong. Rec. $11,253 (daily ed. Sep. 17, 1984) (statement of Sen. Hatch) (emphasizing the importance of Title IX to ensuring development of women athletes); 130 Cong. Rec. $2,267 (daily ed. Mar. 2, 1984) (statement of Sen. Riegle) (pointing to extensive evidence of sex discrimination in education and athletics).

Since that time, Title IX, its regulations, and the 1979 Policy Interpretation have survived constitutional challenges in no

**5.** *See generally, Gender Equity: Men's and Women's Participation in Higher Education,* General Accounting Office, GAO 01–128 (December 2000); *see also Neal v. Bd. of Tr. of Cal. State Univ.,* 198 F.3d 763, 769 (9th Cir. 1999) ("The percentage of college athletes who are women rose from 15% in 1972 to 37% in 1998, and Title IX is at least partially responsible for this trend of increased participation by women."); *Cohen v. Brown Univ.,* 101 F.3d 155, 188 (1st Cir.1996) [hereinafter "Cohen II"] ("There can be no doubt that Title IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports. In addition, there is ample evidence

that increased athletic participation opportunities for women and young girls, available as a result of Title IX enforcement, have had salutary effects in other areas of societal concern."); *Cohen I,* 991 F.2d at 891 ("For college students, athletics offers an opportunity to exacuate leadership skills, learn · teamwork, build self-confidence, and perfect self-discipline. In addition, for many student-athletes, physical skills are a passport to college admissions and scholarships, allowing them to attend otherwise inaccessible schools. These opportunities, and the lessons learned on the playing fields, are invaluable in attaining career and life successes in and out of professional sports.").

fewer than eight federal Circuits. *See Chalenor v. Univ. of N.D.*, 291 F.3d 1042 (8th Cir.2002); *Pederson v. La. State Univ.*, 213 F.3d 858, 879 (5th Cir.2000); *Neal v. Bd. of Tr. of the Ca. State Univ.*, 198 F.3d 763, 770 (9th Cir.1999); *Cohen II*, 101 F.3d 155, 170; *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 274–75 (6th Cir.1994); *Kelley v. Bd. of Tr., Univ. of Ill.*, 35 F.3d 265, 270 (7th Cir.1994); *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir.1993); *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 171 (3d Cir.1993); *Cohen I*, 991 F.2d 888. In each of these cases, the regulatory pronouncements challenged here, whether raised offensively or defensively, were found to be consistent with the Equal Protection component of the Due Process Clause of the Fifth Amendment, as well as with the statute itself, and thus entitled to deference by the courts. *See, e.g., Horner v. Ky. High Sch. Ass'n*, 43 F.3d at 273; *Cohen I*, 991 F.2d at 896–97, 899–900. One Circuit Court went so far as to find that the third prong of the Three Part Test "draws its essence from the statute." *Cohen I*, 991 F.2d at 899 (noting that, in the overall context of the statute and regulations, "[w]hile any single element of this tripartite test, in isolation, might not achieve the goal set by the statute, the test as a whole is reasonably constructed to implement the statute. No more is exigible."). Moreover, upon consideration of many of the same arguments advanced by plaintiffs here, courts have held that the 1979 Policy Interpretation and the 1996 Clarification do not establish "quotas" or impermissibly discriminate against men or men's teams. *See, e.g., Cohen II*, 101 F.3d at 169–70, 172, 176, 184–85 ("Title IX is not

an affirmative action statute; it is an anti-discrimination statute .... No aspect of the Title IX regime at issue in this case—inclusive of the statute, the relevant regulation, and the pertinent agency documents [including the 1979 Policy Interpretation and the 1996 Clarification]—mandates gender-based preferences or quotas, or specific timetables for implementing numerical goals. Like other anti-discrimination statutory schemes, Title IX *permits* affirmative action."); *see also Chalenor v. Univ. of N.D.*, 291 F.3d at 1043; *Pederson v. La. State Univ.*, 213 F.3d at 878–79; *Kelley v. Bd. of Tr.*, 35 F.3d at 271.

These cases are easily divided into two distinct categories. First, there are those cases most characteristic of standard Title IX enforcement, in which, pursuant to Title IX's implied private right of action against a funded institution for violation of the statute,[6] women, as the underrepresented sex in an institution's athletic program, challenged some conduct on the part of the school which adversely affected their opportunities to participate in athletics. *See, e.g. Pederson v. La. State Univ.*, 213 F.3d at 864; *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d at 268, 270; *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d at 826; *Cohen I*, 991 F.2d at 892–93, 905. In such cases, educational institutions have raised challenges to the 1975 Regulations and 1979 Policy Interpretation, and specifically, the Three Part Test, as defenses. In so doing, they have argued that the 1979 Policy Interpretation and its Three Part Test go beyond the statute, exceed the agency's authority, and violate Equal Protection principles by discriminating against the overrepresented sex, or men. *See,*

---

**6.** Although Title IX does not include a citizen-suit provision authorizing enforcement by private individuals, but rather provides only for termination of federal funding upon a finding that a funded entity is discriminating in con-

travention of the statute, 20 U.S.C. § 1682, the U.S. Supreme Court has held that an implied private right of action exists. *Cannon v. Univ. of Chicago*, 441 U.S. at 703, 709, 717, 99 S.Ct. 1946.

*e.g., Pederson v. La. State Univ.,* 213 F.3d at 878; *Cohen I,* 991 F.2d at 899–901; *Roberts v. Colo. State,* 998 F.2d at 826. Pursuant to the Supreme Court's decisions in *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) and *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), courts adjudicating such cases accord considerable deference to DoE's interpretation of the statute, as manifested in the 1975 Regulations and 1979 Policy Interpretation. *See Cohen I,* 991 F.2d at 895 ("The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX;" citing to 1974 Education Amendments); *see also Roberts v. Colo. State,* 998 F.2d at 828. The Three Part Test has consistently been found to be worthy of such deference, as well as enforcement, based on findings that it does not violate the statute or regulations, exceed the agency's statutory authority, or offend constitutional principles of Equal Protection. *Cohen II,* 101 F.3d at 172–73, 175; *Cohen I,* 991 F.2d at 900–01.

The second category of cases, more frequent as of late, involves challenges brought by male athletes who contend that actions taken by educational institutions, in some cases in response to findings by DoE's Office of Civil Rights that their programs did not afford women equal athletic opportunities, violate Title IX and constitutional Equal Protection principles by impermissibly discriminating against men. *See, e.g., Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d at 609–10; *Chalenor v. Univ. of N.D.,* 291 F.3d at 1042, 1043; *Boulahanis v. Bd. of Regents,* 198 F.3d at 634–36; *Neal v. Bd. of Tr. of Cal. State Univ.,* 198 F.3d at 763, 765; *Kelley v. Bd. of Tr.,* 35 F.3d at 265, 267,

270; *Williams v. Sch. Dist. of Bethlehem,* 998 F.2d at 168, 170. In such cases, notwithstanding contentions that DoE's regulatory pronouncements were not entitled to deference because they were contrary to the statute, courts have also afforded "appreciable deference" to the agency's interpretation of the 1975 Regulations embodied in the 1979 Policy Interpretation and, where before the court, the 1996 Clarification. *Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d at 614–15; *Chalenor v. Univ. N.D.,* 291 F.3d at 1046; *Boulahanis v. Bd. of Regents,* 198 F.3d at 637–38; *Neal v. Bd. of Tr. of Cal. State Univ.,* 198 F.3d at 770–71; *Kelley v. Bd. of Tr.,* 35 F.3d at 270; *Williams v. Sch. Dist.,* 998 F.2d at 171. Deference in these cases is also premised on explicit findings that the 1975 Regulations are neither "arbitrary ... [n]or manifestly contrary to the statute," and that the 1979 Policy Interpretation is a reasonable interpretation of those regulations. *Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d at 614–15; *Chalenor v. Univ. N.D.,* 291 F.3d at 1046–47; *Neal v. Bd. of Tr.,* 198 F.3d at 771; *Kelley v. Bd. of Tr.,* 35 F.3d at 270–72 (quoting *Chevron U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 839, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

With respect to the Equal Protection arguments made by male plaintiffs, courts have found collateral attacks on Title IX and its regulations through challenges to university action taken in compliance therewith to be impermissible, and direct challenges to Title IX and the 1975 Regulations as violative of the Constitution to be without merit. *Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d at 613–14; *Neal v. Bd. of Tr.,* 198 F.3d at 772–73; *Boulahanis v. Bd. of Regents,* 198 F.3d at 639; *Kelley v. Bd. of Tr.,* 35 F.3d at 272. Noting that, "[e]ven absent a specific finding that discrimination has occurred, reme-

dial measures mandated by Congress are 'constitutionally permissible to the extent that they serve important governmental objectives ... and are substantially related to achievement of those ends,' " courts have found both prongs of the intermediate scrutiny standard to have been satisfied by the implementation of Title IX under the 1975 Regulations and 1979 Policy Interpretation. *Boulahanis v. Bd. of Regents*, 198 F.3d at 639; *Kelley v. Bd. of Tr.*, 35 F.3d at 272.

Regardless of whether the plaintiffs were women or men alleging discrimination on the basis of sex in the provision of athletic opportunity, in each of these cases the defendant was a federally funded institution, be it a secondary school, athletic association, college, or university. Where an agency's authority to promulgate specific regulations pursuant to Title IX has been challenged, the plaintiff has been a regulated party or association of regulated parties. *See, e.g., N. Haven Bd. of Educ. v. Bell*, 456 U.S. at 512, 517, 102 S.Ct. 1912. (challenge to HEW's authority to issue regulations governing educational institutions' employment practices pursuant to Title IX); *Nat'l Collegiate Athletic Ass'n v. Califano*, 622 F.2d 1382 (10th Cir.1980); *Romeo Cmty. Sch. v. U.S. Dept. of H.E.W.*, 600 F.2d 581 (6th Cir.1979). The parties have cited no cases, and indeed this Court is aware of none, in which similarly situated plaintiffs have directly challenged the validity of the 1975 Regulations, 1979 Policy Interpretation, or 1996 Clarification by way of an action brought against the Department of Education, or its predecessor HEW. *See* Tr. Hr'g 10/15/02 at 80.

## III. Plaintiffs' Claims

### A. Statutory and Constitutional Claims

Essentially, plaintiffs' complaint is that DoE's interpretation of Title IX and the 1975 Regulations, as memorialized in the 1979 Policy Interpretation and 1996 Clarification, have "directly and indirectly ... reduced (and continue to limit) participation opportunities for male athletes" by eliminating men's athletic teams altogether or by "arbitrarily" limiting the number of participants on men's teams. First Am. Compl. ¶ 48. Plaintiffs contend that this result has been accomplished by means of DoE's initiation of "hundreds of administrative enforcement actions and investigations at institutions where athletic participation rates did not match enrollment rates by gender, but where no student has alleged discrimination." *Id.* They allege that these enforcement actions and investigations, allegedly initiated with respect to institutions which did not comply with Title IX under the first prong of the Three Part Test, have led to "negotiated settlements with ... institutions that reduced male participation opportunities." *Id.* Finally, plaintiffs contend that, even in the absence of investigations and enforcement actions by DoE, institutions have, in an effort to avoid such actions, voluntarily reduced men's participation opportunities. *Id.*

Specifically, plaintiffs allege that Bucknell University eliminated its men's intercollegiate wrestling team effective in the 2002–03 academic year solely to bring the institution in compliance with Title IX, and in particular with the first prong of the Three Part Test. First Am. Compl. ¶ 50. Plaintiffs further assert that the University expressly articulated this rationale for its action in a press release issued on May 2, 2001. *Id.* Plaintiffs further assert that Marquette University eliminated its men's intercollegiate wrestling team, notwithstanding the fact that it had been privately funded since 1993, in order to comply with Title IX, and that the University's athletic

director "indicated that Marquette might bring back its wrestling program if the legal requirements changed." First Am. Compl. ¶ 51. Finally, plaintiffs contend that Yale's decision to demote its intercollegiate men's varsity wrestling team to "club status," ostensibly for budgetary reasons despite an offer to endow the team, was made "because of Title IX." First Am. Compl. ¶ 52.

In Counts I and II of their First Amended Complaint, plaintiffs allege, referring to the 1979 Policy Interpretation's Three Part Test and the 1996 Clarification, that neither Title IX nor its implementing regulations authorize DoE to issue a "rule" which permits institutions to engage in gender-conscious cutting or capping of teams to achieve compliance with regulatory standards. Plaintiffs further contend that such a rule permits intentional sex-based discrimination which is not substantially related to the achievement of an "important government objective," thereby violating both constitutional Equal Protection principles and the language of Title IX. Plaintiffs also object to the comparison of gender proportions in the general student body and in athletic programs embodied in the first prong of the Three Part Test, arguing that the comparison contravenes the language of the statute and regulations.[7] Accordingly, plaintiffs maintain that the 1979 Policy Interpretation and the 1996 Clarification violate Title IX, the 1975 Regulations, and principles of Equal Protection embodied in the Due Process

Clause of the Fifth Amendment of the U.S. Constitution.

Plaintiffs raise several additional claims which essentially take a different procedural route to make the same arguments on the merits.

**B. Unlawful Denial of Petition to Amend or Repeal**

In addition to the facial challenge to the 1979 Policy Interpretation and 1996 Clarification made in the first two counts of plaintiffs' First Amended Complaint, plaintiffs also challenge DoE's refusal to amend or repeal the Three Part Test despite a request to do so made by plaintiff NWCA during the 1996 Clarification comment process. Specifically, plaintiffs allege that a letter from Plaintiff NWCA, addressed to DoE's Assistant Secretary for Civil Rights, and written in response to the proposed 1996 Clarification, is a "petition to amend or repeal" as that term is used under the APA, 5 U.S.C. § 553(e) (2003). First Am. Compl. ¶ 74. Plaintiffs further argue that, by issuing the final 1996 Clarification, DoE summarily denied NWCA's petition, and that such denial constituted final agency action that was "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law," thus violating the APA. *Id.* ¶ 77.

**C. Abdication Claim**

The First Amended Complaint also alleges in Count IV that, by promulgating and enforcing the 1979 Policy Interpreta-

---

7. Specifically, plaintiffs refer to 20 U.S.C. § 1681(b), which provides in relevant part,
Nothing contained in ... this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federal pro-

gram or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area ...
and the 1979 Policy Interpretation itself, which authorizes institutions to assess students' athletic interests by any "reasonable method" deemed appropriate. 44 Fed.Reg. 71,417.

tion and the 1996 Clarification, which permit "gender-conscious cutting and capping," DoE has abdicated its statutory duty to enforce Title IX's prohibition against intentional discrimination based on sex. Plaintiffs contend that such "abdication" of DoE's enforcement responsibilities constitutes final agency action subject to judicial review.

## D. Procedural Defects

Finally, plaintiffs contend that, by dint of procedural defects, DoE's implementing regulations, 34 C.F.R. § 106.1–106.71, the 1979 Policy Interpretation, and the 1996 Clarification are null and void, and are of no force or effect. Counts V, VI, and VII allege that DoE implementing regulations (as opposed to the HEW implementing regulations), the 1979 Policy Interpretation and 1996 Clarification constitute new "implementing regulations" or substantive rules which are null and void because they were not approved by the President or his designate as expressly required by the language of Title IX, 20 U.S.C. § 1682, and because they were not promulgated pursu-

ant to the requisite notice and comment rulemaking procedures.

Plaintiffs contend that these alleged constitutional, statutory, and regulatory violations on the defendant's part can be redressed by entry of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02,[8] the APA, 5 U.S.C. § 706(2),[9] and Fed.R.Civ.P. 57, finding that:

I. Title IX does not authorize adoption of a "disparate impact" standard as a surrogate for intentional discrimination;

II. DoE is prohibited from requiring or authorizing educational institutions to engage in "gender-conscious" cutting or capping to meet a disparate impact standard;

III. to the extent that gender conscious decisions regarding athletic programs are permitted, educational institutions are to use athletic interest and ability, not enrollment, as the relevant population;

---

**8.** The Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 provides, in relevant part, that

In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (2003). "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202 (2003).

**9.** Under the APA, a court reviewing agency action "shall"

hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B) contrary to constitutional right, power, privilege, or immunity;
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
(D) without observance of procedure required by law;
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
5 U.S.C. § 706(2) (2003).

IV. the relevant unit of "athletic opportunity" under the regulations is a spot on a team, not an athlete on a team;

V. DoE unlawfully denied plaintiff NWCA's petition to amend or repeal the "Three–Part Test" and to revise its enforcement policies to reflect the manifestly changed circumstances in 1996;

VI. DoE, by its 1996 Clarification consciously and expressly adopted a general policy which abdicates its statutory duty to prevent intentional gender discrimination;

VII. DoE's Title IX implementing regulations, the 1979 Policy Interpretation, and the 1996 Clarification are null and void.

Additionally, plaintiffs request that this Court issue an order

I. vacating the 1996 Clarification and the "Three–Part Test" as arbitrary and capricious, and promulgated without following the procedures required by law;

II. instructing DoE to conduct notice-and-comment rule-making to amend its Title IX implementing regulations with respect to intercollegiate athletics in a manner consistent with Title IX, the Constitution, and the declaratory relief requested;

III. retaining this Court's jurisdiction over the matter until such rules are promulgated and become effective;

IV. staying "all disparate impact components" of DoE's Title IX "rules" concerning athletics until new rules are promulgated;

V. Awarding plaintiffs attorneys' fees and costs.

## IV. Motion to Dismiss

Defendant moves to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(1), alleging that this Court lacks subject matter jurisdiction over plaintiffs' claims. Specifically, defendant contends that plaintiffs lack standing under Article III of the United States Constitution because they cannot demonstrate that the relief they seek will redress the injuries they claim. Def.'s Mot. to Dismiss at 2. In the alternative, the defendant submits that, even if this Court were to find standing, plaintiffs' constitutional and statutory claims fall outside the scope of the waiver of sovereign immunity embodied in the APA and the applicable statute of limitations, plaintiffs fail to allege facts sufficient to establish jurisdiction under the APA provision governing petitions to amend or repeal regulations, 5 U.S.C. § 553(e), and all of plaintiffs' remaining claims are time-barred to the extent they concern the 1979 Policy Interpretation. *Id.* at 3–4, 25–30, 31–33.

This Circuit has recently reiterated the standard governing motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(1):

> A complaint may be dismissed for lack of subject matter jurisdiction only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " In our review, this court assumes the truth of the allegations made and construes them favorably to the pleader.

*Empagran S.A. v. F. Hoffman–LaRoche, Ltd.,* 315 F.3d 338 (D.C.Cir.2003). In the Rule 12(b)(1) context, the plaintiff bears the burden of establishing the Court's jurisdiction. *See, e.g., Tripp v. Executive Office of the President,* 200 F.R.D. 140, 142 (D.D.C.2001); *Vanover v. Hantman,* 77 F.Supp.2d 91, 98 (D.D.C.1999). In so doing, the plaintiff may rely on, and the

Court may consider, materials outside of the pleadings without converting a motion to dismiss to one for summary judgment. *See* Fed.R.Civ.P. 12(b)(1); *Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion ... the court may inquire, by affidavits or otherwise, into the facts as they exist."); *Teva Pharmaceuticals, USA, Inc. v. U.S. Food and Drug Admin.*, 182 F.3d 1003, 1008 (D.C.Cir.1999); *Artis v. Greenspan*, 158 F.3d 1301, 1305–06 (D.C.Cir.1998).

## A. Motion to Amend Complaint

Several weeks after oral argument was heard on defendant's motion to dismiss, plaintiffs filed a motion for leave to file a Second Amended Complaint ("Pl.'s Mot."). In their proposed Second Amended Complaint, plaintiffs seek to expand their allegations in several key areas. First, they seek to add the Secretary of Education and the Assistant Secretary of Civil Rights, in their official capacities, as defendants to this action. Proposed Second Amended Complaint for Declaratory and Injunctive Relief ("Second Amended Compl.") ¶ 1.

Second, plaintiffs request leave to amend their allegations regarding the composition of plaintiff associations. For instance, plaintiffs now seek to allege that plaintiff NWCA, in addition to "representing the interests of collegiate and scholas-

tic wrestling coaches," First Am. Compl. ¶ 4, now includes among its membership not only "member coaches," *id.*, but also "coaches, alumni, and the general public ... [and] federally funded colleges, universities, high schools, and associations of high schools that are directly affected by the Title IX rules challenged in this action." Second Am. Compl. ¶ 4. In support of these proposed allegations, plaintiffs submit an affidavit from Patrick A. Tocci, II NWCA's Director of Administration, who affirms that NWCA counts among its members colleges, universities, high schools and high school associations in more than 35 states, which, upon information and belief, receive federal funding. Tocci Decl. ¶ 3. Additionally, Mr. Tocci specifically alleges that Muhlenberg College and Northwestern University are members of plaintiff NWCA. *Id.* ¶ 4, Supp. Tocci Decl. ¶ 3. Also, plaintiffs wish to add that Bucknell Wrestling's members include Jacob E. O'Donnell, Class of '05, who was a member of Bucknell's men's intercollegiate wrestling team during the 2001–02 season, and who wishes to compete for the University during the 2002–03, 2003–04, and 2004–05 seasons.

Third, plaintiffs' proposed Second Amended Complaint seeks to add, as sources of authority for granting the requested relief, 28 U.S.C. §§ 1331, 1343(a)(4),[10] 1346(a)(2), 1361,[11] the Acts of March 3, 1863, 12 Stat. 762, and June 25, 1936, 49 Stat. 1921 (as amended),[12]

---

**10.** 28 U.S.C. § 1343 (2003). Civil Rights and elective franchise

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

...

(4) To recover damages or secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

**11.** 28 U.S.C. § 1361 (2003) provides:

The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

**12.** The Acts of March 3, 1863, 12 Stat. 762, and June 25, 1936, 49 Stat. 1921, reorganized and set forth the powers and jurisdiction of the courts of the District of Columbia.

D.C.Code § 11–501,[13] and the Court's equitable powers.

Fourth, the proposed Second Amended Complaint would amend Count IV to include a claim that the promulgation of the 1979 Policy Interpretation and 1996 Clarification not only represent an abdication of DoE's obligation to enforce Title IX's prohibition against sex-based discrimination, but also constitute *ultra vires* acts undertaken by the agency. Second Am. Compl. ¶¶ 103–05, Prayer for Relief ¶ 126 A(vii).

Finally, plaintiffs' Second Amended Complaint seeks to add numerous and significant factual allegations. For instance, the Second Amended Complaint would include substantially expanded allegations regarding DoE's enforcement actions since 1996. Second Am. Compl. ¶¶ 58–61, 63. Specifically, plaintiffs would allege that, on information and belief, on or about January 5, 2000, [DoE] negotiated and entered into a compliance agreement with Northwestern University that requires Northwestern either to meet prong one of the Three–Part Test … by June 30, 2002 or to conduct a survey of the interests and abilities of female (but not male) students to demonstrate compliance with the Three–Part Test, as revised by the 1996 Clarification … As a result of the compliance agreement, with [DoE's] knowledge, monitoring, and assent, Northwestern has imposed caps on men's teams that affect members of Plaintiffs NWCA and CSC, including without limitation the men's swimming and wrestling coaches at Northwestern. Second Am. Compl. ¶ 61. Plaintiffs would also rely on a report by the General Accounting Office, which they contend documents acknowledgments by educational institutions, some of which are members of

plaintiff organizations, that men's teams are cut in order to comply with the Three Part Test, as well as recent Circuit Court opinions noting that defendant educational institutions justified elimination of men's athletic programs as part of an effort to comply with the Three Part Test. Second Am. Compl. ¶¶ 64, 69–70.

Additionally, plaintiffs now wish to contend that the 1996 Clarification represented the first pronouncement by DoE that it, like its predecessor HEW, would evaluate interscholastic athletic programs' compliance with Title IX under the Three Part Test. Second Am. Compl. ¶¶ 52, 79, 121. Similarly, they contend that the 1996 Clarification represents the agency's first acknowledgment subsequent to the U.S. Supreme Court's decision in *Grove City v. Bell* and the enactment of the Civil Rights Restoration Act that the Three Part Test applies to athletic departments which do not directly receive federal funds. Second Am. Compl. ¶ 53. The Second Amended Complaint also submits that the 1996 Clarification's interpretation of the third prong of the Three Part Test ·is substantially different from that contained in the agency's 1980 enforcement manual, prepared for and used by DoE investigators. Second Am. Compl. ¶¶ 54, 80, 122.

Plaintiffs further wish to allege that, although DoE prepared enforcement manuals in 1980 and 1990, it did not publish them or incorporate them by reference in the Federal Register. Second Am. Compl. ¶ 42. Plaintiffs also seek to include allegations regarding the procedure by which the 1996 Clarification was developed and disseminated, noting that DoE did not follow any procedure previously published in the Federal Register with respect to the

---

**13.** D.C.Code § 11–501 (2003) sets forth the civil jurisdiction of the United States District Court for the District of Columbia above and beyond its jurisdiction as a United States District Court.

process by which the final 1996 Clarification was developed, nor did it publish the final 1996 Clarification in the Federal Register. Second Am. Compl. ¶¶ 55, 56, 99.

Finally, plaintiffs wish to add an allegation that "institutions, athletic directors, and coaches who are members" of plaintiff organizations must engage in conduct which violates Title IX in order to comply with DoE's interpretation of the statute and regulations, but cannot "sue themselves" to obtain a remedy for this alleged injury to them. Second Am. Compl. ¶ 71. They also seek to contend that enforcement actions against schools are not effective remedies for their student-athlete members because "schools typically announce cutting and capping decisions in the Spring after the deadline for applying to transfer."

Fed.R.Civ.P. 15(a) governs plaintiffs' motion for leave to file a Second Amended Complaint. Under that Rule, in the current procedural posture, plaintiffs may only amend their complaint upon leave of the court or by written consent of the adverse party. Fed.R.Civ.P. 15(a). However, the Rule mandates that "leave shall be freely given when justice so requires." *Id.* The D.C. Circuit has provided further guidance with respect to the application of this standard, holding that "a district court should grant leave to amend a complaint '[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, futility of amendment, etc.' Within these bounds, a district court has discretion to grant or deny leave to amend under Rule 15(a)." *Atchinson v. District of Columbia,* 73 F.3d 418, 425–26 (D.C.Cir.1996) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

It is clear from the language cited above that Fed.R.Civ.P. 15(a) and D.C. Circuit precedent do not compel the grant of leave to amend a complaint in every instance. *See Graves v. United States,* 961 F.Supp. 314, 317 (D.D.C.1997). The Court need only base its ruling on a valid ground when exercising its discretion. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1099 (D.C.Cir. 1996).

■ "Courts may deny a motion to amend a complaint as futile ... if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. v. Ludwig,* 82 F.3d at 1099; *see also Atchinson v. District of Columbia,* 73 F.3d at 425; *Moldea v. N.Y. Times,* 22 F.3d 310, 319 (D.C.Cir.1994); *Price v. Phoenix Home Life Ins. Co.,* 44 F.Supp.2d 28, 33 (D.D.C. 1999), *aff'd,* 203 F.3d 53, 1999 WL 1021927 (D.C.Cir.1999) (table, text in Westlaw); *Mittleman v. United States,* 997 F.Supp. 1, 10 (D.D.C.1998); *Graves v. United States,* 961 F.Supp. at 317; *Monroe v. Williams,* 705 F.Supp. 621, 623–24 (D.D.C.1988) (citing cases). For instance, in *James Madison Ltd.,* the D.C. Circuit upheld the District Court's denial of a motion for leave to amend a complaint to add counts challenging on Due Process grounds the statute under which the Federal Deposit Insurance Corporation placed several banks under receivership. *James Madison Ltd. v. Ludwig,* 82 F.3d at 1099. The court found that, on the facts alleged in the complaint, there had been no due process violation. *Id.* Similarly, The D.C. Circuit has upheld denial of permission to amend a complaint to assert claim of false light invasion of privacy where plaintiff's claim for defamation could not survive summary judgment. *Moldea v. N.Y. Times,* 22 F.3d at 319–20. In so holding, the court stated that the plaintiff could not avoid the constitutional

requirements of a defamation claim by asserting related causes of action. *Id.* Where an original complaint asserting claims under 42 U.S.C. § 1983 explicitly named a police officer as a defendant in his official capacity only, but, on the eve of trial, plaintiff sought to amend the complaint to name the officer as a defendant in his individual capacity, a District Court found, *inter alia,* that such an amendment would be futile because the officer would be immune from liability under the doctrine of qualified immunity. *Atchinson v. District of Columbia,* 73 F.3d at 424 (Circuit Court expressly did not consider District Court finding that amendment would be futile). And, where the Civil Service Reform Act and the Privacy Act provided exclusive remedies for the injuries claimed by a plaintiff, the District Court denied a motion for leave to amend the complaint to add claims under 42 U.S.C. § 1985(1) and the Fifth Amendment, on the grounds that such an amendments would be futile as the claims would not survive a motion to dismiss. *Mittleman v. United States,* 997 F.Supp. at 10–11.

Plaintiffs have also sought, as do plaintiffs here, to add additional defendants and factual allegations, as well as additional counts, on motions for leave to file amended complaints brought pursuant to Fed. R.Civ.P. 15(a). *See, e.g., Mount v. Baron,* 154 F.Supp.2d 3, 7–8 (D.D.C.2001); *Graves v. United States,* 961 F.Supp. 314, 317 (D.D.C.1997). Where, notwithstanding the proposed addition of new defendants and claims, a proposed amended complaint failed to allege any facts demonstrating proximate causation, simultaneous grant of a motion to dismiss and denial of a motion for leave to amend the complaint was deemed appropriate. *See, e.g., Mount v. Baron,* 154 F.Supp.2d at 7–10. Similarly, where a proposed amendment to the complaint would add new defendants, but plaintiff failed, as a matter of law, to allege

any conduct on the part of those defendants amounting to conspiracy to deprive plaintiff of his civil rights, motion for leave to amend was denied while defendants' motion to dismiss was granted. *Graves v. United States,* 961 F.Supp. at 317–18.

Amendments proposed to cure jurisdictional defects have likewise been denied where "the plaintiff's amendment is futile because the claims encompassed by it will not cure the deficiencies of the original complaint, namely lack of subject matter jurisdiction." *Price v. Phoenix Home Life Ins. Co.,* 44 F.Supp.2d at 33 (denying plaintiff leave to add state law claims where original complaint failed to allege facts sufficient to sustain diversity or federal question jurisdiction).

Defendant contends that plaintiffs' proposed amendments are futile because they do not correct the jurisdictional defects alleged in the motion to dismiss, and that plaintiffs' motion should therefore be denied and the motion to dismiss granted. In order to evaluate these contentions, as well as plaintiffs' responses thereto, plaintiffs' proposed amendments will each be considered in turn, in addition to the allegations contained in the First Amended Complaint, in the discussion of the merits of defendant's motion.

### B. Standing

As an initial matter, DoE argues that this court is without subject matter jurisdiction over plaintiffs' action because plaintiffs lack standing to bring their claims. All of the plaintiffs in this action are membership organizations, and must therefore either establish standing in their own right or on behalf of their members. *See Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1387.

The D.C. Circuit has recently reiterated the associational standing rule es-

tablished by the U.S. Supreme Court, holding that

> [a]n association only has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Fund Democracy, LLC v. Securities and Exchange Commission*, 278 F.3d 21, 25 (D.C.Cir.2002) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)). Because this requirement is jurisdictional in nature, the Court must satisfy itself that plaintiffs have indeed made allegations sufficient to support associational standing.

■ Defendant does not directly address plaintiffs' assertion of associational standing because it contends that plaintiffs have not met the threshold requirement of demonstrating that their "members would otherwise have standing to sue in their own right." [14] Def.'s Mot. at 11, citing *Fund Democracy*, 278 F.3d at 25. Defendant emphasizes, relying on Supreme Court precedent of long standing, that plaintiffs' status as associations seeking to bring claims on behalf of their members "does not eliminate or attenuate the constitutional requirements of a case or controversy." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Plaintiffs, as associations, can, however, establish standing so long as their members, "or any one of them," would have standing to bring their claims. *Id.*

In their proposed Second Amended Complaint, plaintiffs seek to add the allegation that plaintiff NWCA is itself injured by the defendant's conduct, contending that, as an organization supported by membership dues, it is harmed when the number of dues-paying members decreases because educational institutions discontinue their wrestling programs in response to the 1979 Policy Interpretation and the 1996 Clarification. *See* Second Am. Compl. ¶ 4; Tocci Decl. ¶¶ 5–6. Therefore, both NWCA's standing as an organization, as well as its associational standing must be considered in order to resolve defendant's motion.

### 1. *Article III standing*

The Supreme Court has held that the "irreducible constitutional minimum of standing" requires satisfaction of three elements:

> First and foremost, there must be alleged (and ultimately proved) an "injury in fact"—a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

---

**14.** Plaintiffs misunderstand defendant's position as conceding that plaintiffs have met the other elements of associational standing. Pl.'s Opp'n at 7, n. 6. Plaintiffs nevertheless contend that they have met all three prongs of the associational standing test. Pl.'s Opp'n at

7, n. 6. Because defendant's arguments with respect to plaintiffs' members' Article III standing do not dispose entirely of plaintiffs' claims, the Court will consider whether plaintiffs have sufficiently alleged all prongs of the associational standing test.

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102–04, 118 S.Ct. 1003, 1016–1017, 140 L.Ed.2d 210 (1998) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presume that the general allegations embrace those specific facts which are necessary to support the claim.'" *Lujan v. Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. 2130. Plaintiffs' standing to bring each of their claims will now be evaluated in turn.

## COUNTS I & II CONSTITUTIONAL AND STATUTORY CHALLENGES

### a. *Injury-in-fact*

In each of these counts, plaintiffs allege that Title IX's regulations, the 1979 Policy Interpretation, and the 1996 Clarification have directly and indirectly reduced and limited participation opportunities for male athletes, thus presenting a concrete harm to their student-athlete members. *See* First Am. Compl. ¶ 48, Count I, Count II.

Specifically, plaintiffs contend that the 1979 Policy Interpretation's "Three-Part Test" denies their student-athlete members the equal protection of laws by encouraging institutions to cut or cap men's teams to comply with Title IX under the first prong, expand women's athletic opportunities without expanding men's opportunities under the second prong, or "fully accommodate" women's athletic interests without "fully accommodating" men's interests under the third prong. Pl.'s Opp'n at n. 4 and accompanying text, 9. Plaintiffs contend their student-athlete members are therefore placed on an "unequal footing" compared to women, which in turn invades a legally protected interest of plaintiffs' members in a particularized manner. Pl.'s Opp'n at 9, *citing Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (claims alleging denial of equal protection of laws give rise to an injury preventing plaintiffs "from competing on an equal footing").

Plaintiffs also allege that the challenged regulations and interpretations have forced their coach and athletic director members to serve as unwitting instruments of discriminatory actions by requiring them to cut and "cap" men's teams. First Am. Compl. ¶ 50; Pl.'s Opp'n at 10–11. Although the D.C. Circuit cases cited by plaintiffs do not necessarily hold that persons forced to engage in discriminatory conduct suffer an injury in their own right as a result of being so compelled,[15] it is

---

15. *See Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 350 (D.C.Cir.1998) (commenting that "forced discrimination itself may be an injury," citing a Ninth Circuit case, but holding that church instead had third party standing: "when the law makes a litigant an involuntary participant in a discriminatory scheme, the litigant may attack that scheme by raising a third party's constitutional rights. There can be no doubt that the Church [as an employer] has standing to make its Fifth Amendment challenge [to FCC equal employment opportunity regulations]."). This reading of the *Lutheran Church* holding is supported by the Circuit's opinion in *Fraternal Order of Police v. United States,* 152 F.3d 998, 1002 (D.C.Cir.1998), the other case relied upon by plaintiffs, in which the court held "where a person is effectively used by the government to implement a discriminatory scheme, he may, as we held in [*Lutheran Church*] 'attack that scheme by raising a third party's constitutional rights.'"

Plaintiffs also allege a direct injury to their member-coaches arising from potential exposure to liability under Title IX based on their participation in efforts to comply with the challenged policies. *See* Pl.'s Opp'n at 11. However, the D.C. Circuit appears to have found that potential legal liability does not constitute a direct injury for purposes of

conceivable that coaches in particular potentially suffer a direct economic harm through loss of employment if, as plaintiffs allege, the challenged regulations lead educational institutions to cut men's teams. *See* Pl.'s Opp'n at 11, First Am. Compl. ¶¶ 4, 8, 48. Moreover, the cases cited by plaintiffs lend support to the notion that coaches and athletic directors have third party standing to assert the rights of student athletes against whom they are allegedly "forced" to discriminate. *See Fraternal Order of Police v. United States,* 152 F.3d 998, 1002 (D.C.Cir.1998); *Lutheran Church–Missouri Synod v. FCC,* 141 F.3d 344, 350 (D.C.Cir.1998).

■ Plaintiffs submit that their alumni and spectator members suffer an injury to their "aesthetic interest" in particular men's teams and sports. Pl.'s Opp'n at 10. However, plaintiffs allege no specific facts and cite no authority in support of the standing of these particular members. For instance, plaintiffs do not allege that their alumni and spectator members have in the past attended sporting events which are no longer available as a result of defendant's conduct. Nor have they alleged that plaintiffs' members would attend such events were they to again become available pursuant to relief afforded by this Court. It would therefore appear that under *Lujan,* plaintiffs have not alleged facts sufficient to establish injury-in-fact for their alumni and spectator members. *Lujan,* 504 U.S. at 562–64, 112 S.Ct. 2130 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing. But the injury-in-fact test requires more than an injury to a cognizable interest. It requires

that the party seeking review be himself among the injured."); *see also American Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros.,* 317 F.3d 334 (D.C.Cir.2003) (plaintiff expressed desire and intent to visit elephants in the future).

■ Nevertheless, injury-in-fact to "any one" of plaintiffs' members is sufficient to meet the requirements of the associational standing test. *Warth v. Seldin,* 422 U.S. at 511, 95 S.Ct. 2197. It appears beyond dispute that plaintiffs have sufficiently alleged that at least some of their members, at a minimum student-athletes and coaches, are currently sustaining injuries that are concrete, particularized, direct, and immediate, and not conjectural or hypothetical. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. at 102–04, 118 S.Ct. 1003. Defendant does not contend otherwise.

Were plaintiffs' motion for leave to file the Second Amended Complaint granted, plaintiffs would also allege that their educational institution members have suffered injury-in-fact as a result of DoE's conduct. Second Am. Compl. ¶ 4. Specifically, plaintiffs would aver that plaintiff NWCA's member institutions, among others, "have cut hundreds of men's teams and capped hundreds of men's participation opportunities," and therefore have been injured by being "forced to serve ... as the involuntary participants" in a discriminatory scheme. Second Am. Compl. ¶¶ 64, 65, 71. While, as noted above, if accepted as true, these allegations may be sufficient to confer third party standing on institutions to assert the rights of their student athletes, under D.C. Circuit precedent it is unclear whether such allegations rise to the level of injury-in-fact to the institutions them-

standing analysis, preferring to ground standing for similarly situated plaintiffs in third party standing. *See Fraternal Order of Police,* 152 F.3d at 1002 (recognizing supervising

officers' potential liability for failure to comply with challenged statute, holding that supervising officers had third party standing).

selves. *See Fraternal Order of Police v. United States*, 152 F.3d at 1002; *Lutheran Church–Missouri Synod v. FCC*, 141 F.3d at 350.

Perhaps more importantly, plaintiffs fail to specify which of their institutional members have been harmed by serving as involuntary participants in a discriminatory scheme, and under what circumstances. While Muhlenberg College is named in the declaration accompanying the proposed Second Amended Complaint as one specific institutional member among many, there is no mention of any action taken by Muhlenberg College in response to the 1979 Policy Interpretation or 1996 Clarification. *See* Tocci Decl. ¶ 4. Therefore, there is no conceivable basis for asserting an injury-in-fact to this institutional member of plaintiff NWCA, nor for the College to have third party standing to challenge the 1979 Policy Interpretation or 1996 Clarification on behalf of its student athletes.

Recognizing the liberal pleading requirements reflected in the Federal Rules of Civil Procedure and the governing case law, the Court remains cognizant that "[i]t is the responsibility of the complainant to clearly allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991). While we must presume that "general allegations embrace those specific facts which are necessary to support the claim," *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130, we are not required to fill in critical *lacunae* in plaintiffs' allegations. This is particularly true where, as here, those facts are uniquely within plaintiffs' knowledge, and therefore failure to allege them with sufficient specificity to provide notice of the precise basis for standing to maintain this suit cannot be overlooked.

Plaintiffs do make specific allegations regarding Northwestern University's efforts to comply with the 1979 Policy Interpretation and 1996 Clarification, and attach a voluntary agreement entered into between Northwestern and DoE's Office of Civil Rights ("OCR"). Second Am. Compl. ¶ 61. However, nowhere in the Second Amended Complaint or the declaration accompanying it do plaintiffs allege how they contend Northwestern University, as opposed to its student athletes and coaches, was harmed by entering into the settlement agreement beyond the generalized claim, discussed above, that it was "forced to serve" as an instrument of unlawful discrimination.

Nevertheless, the Court need not resolve the question of whether the allegations of the Second Amended Complaint are sufficient as a matter of law to establish injury-in-fact with respect to either plaintiff NWCA as an organization, or its educational institution members, as it finds that the allegations made in the First Amended Complaint, claiming denial of athletic opportunity on the basis of sex, are sufficient to establish injury-in-fact, at least with respect to plaintiffs' student-athlete and coach members. Moreover, even if injury-in-fact to NWCA and its educational institution members is presumed based on the allegations of the Second Amended Complaint, for the reasons outlined below, the Court finds that these allegations fail to support plaintiffs' standing on causation and associational standing grounds, respectively.

b. *Causation and Redressability*

The D.C. Circuit has succinctly articulated the analysis to be applied under the second and third prongs of the Article III standing test as follows:

Causation, or "traceability" examines whether it is substantially probable that

the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff. Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.

*Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 663–64 (D.C.Cir.1996) (en banc). Although causation and redressability are two separate prongs of the constitutional standing test, they are often addressed together, particularly in cases such as this. *See Freedom Republicans, Inc. v. FEC,* 13 F.3d 412, 418 (D.C.Cir.1994) ("When plaintiffs' claim hinges on the failure of government to prevent another party's injurious behavior, the 'fairly traceable' and redressability inquiries appear to merge.").

▮ Defendant's main argument in support of the motion to dismiss is that plaintiffs cannot establish redressability on the facts alleged in the First Amended Complaint, while *amici* National Women's Law Center *et al* focus on the causation aspect of the standing inquiry. *See* Def.'s Mot. at 12, 13; NWLC Brief at 2. In support of their contention that the 1979 Policy Interpretation and the 1996 Clarification are the cause of their injuries, and that the relief requested would redress their harm, plaintiffs allege that, as part of its efforts to enforce the Three Part Test of the 1979 Policy Interpretation and the 1996 Clarification, DoE has initiated "hundreds" of investigations and administrative enforcement actions at funded educational institutions. First Am. Compl. ¶ 48. Plaintiffs contend that, as a direct result of DoE's enforcement efforts, educational institutions have negotiated settlement agreements with DoE which have reduced male participation opportunities. First Am. Compl. ¶ 48. Plaintiffs also allege that, in an effort to avoid such enforcement ac-

tions, institutions have preemptively limited male participation opportunities under the belief that doing so would bring them into compliance with the Three Part Test. *Id.*

Plaintiffs specifically allege that both Bucknell University and Marquette University expressly cited compliance with Title IX, and in the case of Bucknell, particularly the first part of the "Three-part Test," as the primary reason for cutting their men's wrestling teams. First Am. Compl. ¶¶ 50–51. Finally, plaintiffs allege "on information and belief" that compliance with Title IX informed Yale University's decision to cut its wrestling program despite an offer to endow the program through private funding. First Am. Compl. ¶ 52. Plaintiffs argue that striking down the 1996 Clarification and the Three Part Test of the 1979 Policy Interpretation, as well as issuing a judicial declaration that it is unlawful under Title IX for DoE to authorize institutions to engage in gender-conscious "cutting and capping," would redress their injuries by removing offending agency interpretations while leaving in place gender-neutral statutory and regulatory protections against intentional discrimination. First Am. Compl. ¶ 53.

Plaintiffs' allegations and argument focus primarily on the first prong of the Three Part Test, which they characterize as a "quota," requiring "equal participation" based on enrollment rather than the "equal opportunity" based on interest envisioned by the 1975 Regulations. First Am. Compl. ¶¶ 49, 53. Plaintiffs maintain that the existence of the so-called "quota" embodied within the first prong of the Three Part Test was a substantial factor, if not the only factor, motivating decisions by institutions such as Bucknell to intentionally discriminate against men by cutting men's athletic teams. *Id.*

Plaintiffs also allege that, under circumstances where men's actual interest in athletics is greater than women's, compliance with the second or third prong of the Three Part Test also constitutes unlawful discrimination against men. Pl.'s Opp'n at 9; First Am. Compl. ¶ 65. Under such circumstances, if an institution complies with the second prong of the Three Part Test, it will expand women's athletic opportunities without a concomitant expansion of men's opportunities, notwithstanding greater interest in athletics among men. Similarly, an institution complying with the third prong of the Three Part Test will fully accommodate women's interests in athletics without fully accommodating men's interests, regardless of whether men's interests are greater. Therefore, plaintiffs contend that, no matter which prong of the Three Part Test an institution seeks to comply with, its compliance constitutes unlawful discrimination on the basis of sex in violation of Title IX.

Both parties concede that plaintiffs are, in large part, challenging third-party conduct, namely that of educational institutions seeking to comply with Title IX as currently enforced. *See* Def.'s Mot. at 13; Pl.'s Opp'n at 9. As the U.S. Supreme Court pointed out in *Lujan*,

> [w]hen ... a plaintiff's injury arises from the government's allegedly unlawful regulation ... of someone else ... causation and redressability ordinarily

hinge on the response of the regulated ... third party to the government action ... The existence of ... standing depends on the unfettered choices made by independent actors not before the courts ... whose exercise of broad and legitimate discretion the courts cannot presume to control or predict, and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Lujan*, 504 U.S. at 562, 112 S.Ct. 2130.

Plaintiffs nevertheless contend that the conduct on the part of educational institutions which results in the injuries alleged is the direct result of DoE's promulgation and enforcement of the 1979 Policy Interpretation and the 1996 Clarification.[16] *See* Pl.'s Opp'n at 9. Arguing that exercise of institutional discretion under DoE's Title IX enforcement scheme is confined to selecting among the three options offered by the Three Part Test, all of which injure their members by placing them on an "unequal footing," plaintiffs assert that the Three Part Test so constrains the choices of educational institutions that the "third parties" in question have no option but to unlawfully harm plaintiffs. *See* Pl.'s Opp'n at 9, n. 9; Tr. Hr'g 10/15/02 at 113.

Noting that indirectness of injury, while not necessarily fatal to standing, may make it "substantially more difficult" to

**16.** Plaintiffs do contend that, in cases where DoE has entered into settlement agreements requiring compliance with the first part of the "Three–Part Test," DoE "directly" causes the resulting injuries. However, the decisions creating the circumstances triggering a DoE investigation or enforcement action, as well as the need for a settlement agreement in the first place, are uniquely within the discretionary purview of third party educational institutions. Third party educational institutions also ultimately decide whether to enter into such settlement agreements or forego federal

funding and contest DoE's interpretation and enforcement of Title IX in an action under 20 U.S.C. § 1682 (authorizing judicial review of an agency action "terminating or refusing to grant or to continue federal assistance"). Therefore, plaintiffs' student athlete and coach members cannot claim to be "directly regulated" by DoE through such agreements, nor can they circumvent causation/redressability questions by alleging direct injury as a result of settlement agreements voluntarily negotiated by third party educational institutions with DoE.

establish, defendant responds that plaintiffs are unable to demonstrate that it is likely, and not merely speculative, that invalidation of DoE's interpretation of Title IX, as manifested through the Three Part Test and 1996 Clarification, will redress their injuries. *See* Def.'s Mot. at 14–18, n. 2. Defendant contends that a number of other factors, some of which will continue to operate regardless of whether the Court awards the relief requested, inform the decisions of the educational institutions subject to the challenged regulations. *See* Def.'s Mot. at 14–18, n. 2. DoE places particular emphasis on the premise that educational institutions would still be bound by and subject to liability under Circuit Court decisions upholding DoE's interpretation of Title IX, and concludes on this basis that they are therefore unlikely to cease the conduct at issue should this Court declare the challenged interpretations invalid. Def.'s Mot. at 15; Def.'s Reply at 4.

However, plaintiffs correctly counter that if the Court awards the entirety of the relief requested, the challenged interpretations of Title IX and the 1975 Regulations would in effect be repealed, and DoE would be required to promulgate new rules and interpretations which do not authorize compliance with Title IX through any of the means set forth in the Three Part Test. As a result, Circuit opinions upholding and deferring to DoE's current interpretation of Title IX and its regulations would no longer be relevant, as courts would now defer to the new regulatory interpretation. Pl.'s Opp'n at 12–13, n. 11; Tr. Hr'g 10/15/02 at 45, 71.

Defendant's contention that plaintiffs' argument is "fanciful" misses the point. Def.'s Reply at 5–6. Plaintiffs are not alleging that, upon issuance of the requested relief by this Court, their remedy would then lie in subsequent actions against edu-cational institutions based on this Court's order, notwithstanding the existence of controlling or persuasive authority upholding DoE's current interpretation of Title IX and its regulations. *See id.* at 6. Rather, plaintiffs contend that an award of the requested relief would, by striking down the 1979 Policy Interpretation's Three Part Test and the 1996 Clarification, remove any motivation for educational institutions to engage in the conduct alleged to cause them harm. Pl.'s Opp'n at 13; Tr. Hr'g 10/15/03 at 110. In the absence of any regulatory motivation for cutting or capping men's teams, expanding women's programs without expanding men's programs, or fully accommodating women's, but not men's, athletic interests in order to comply with one of the three prongs of the Three Part Test, plaintiffs submit that educational institutions would voluntarily cede to the then strengthened arguments of groups such as plaintiffs to increase or maintain men's athletic opportunities. *Id.*

Notwithstanding this important point, plaintiffs have not alleged any facts which would allow them to meet even the minimal burden of pleading causation and redressability under the motion to dismiss standard. With respect to causation, plaintiffs have not alleged, beyond conclusory assertions, that the Three Part Test represents a "substantial factor" in third party decision-making. *See* Pl.'s Opp'n at 12–13; Def.'s Mot. at 17; Def.'s Reply at 3–4; First Am. Compl. ¶¶ 50–51; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C.Cir.1990) ("For standing purposes, petitioners need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test. This is true even where the injury hinges on the reactions of third parties ... to the agency's conduct. In such cases, the alleged injury must be traced back through the actions of the

intermediary parties to the challenged government decision."); *Bldg. & Constr. Trades Dept., AFL–CIO v. Allbaugh,* 172 F.Supp.2d 138, 150 (D.D.C.2001), *rev'd* on other grounds, 295 F.3d 28 ("[I]t is clear that when plaintiffs can prove that the federal government's conditional funding offer is the *actual* and *only* reason for a recipient's decision, causation has been established."). In fact, plaintiffs appear to concede the point by acknowledging that even if the Court granted the relief requested, plaintiffs and their opponents would still be arguing their respective positions to educational institutions, including Bucknell, Marquette, and Yale, which would, in turn, continue to make discretionary determinations with respect to capping, cutting and adding teams based on a number of factors, including those set forth in the 1975 Regulations, as well as factors separate and apart from Title IX and its attendant regulations. *See* Pl.'s Opp'n at 13. With respect to redressability, plaintiffs also contend that they have alleged facts sufficient to meet the "likelihood" of redress necessary to confer standing. Pl.'s Opp'n at 12. For instance, they point to their allegations, based on a press release issued by Bucknell University, that the institution cut its men's wrestling team solely to meet the first prong of the Three Part Test, and submit that, if the 1979 Policy Interpretation and the 1996 Clarification are stricken, because private funding is available to support the Bucknell wrestling team, "presumably" Bucknell University would reinstate a varsity men's wrestling team. Tr. Hr'g 10/15/02 at 118–19. Plaintiffs also allege that Marquette's athletic director has stated that Marquette "might" bring back its wrestling program "if the legal requirements changed." First Am. Compl. ¶ 51. No allegations whatsoever are made regarding the effect the requested relief would have on Yale University's decision to cut its men's wrestling program. Responding to the Court's query regarding the speculative nature of such predictions, plaintiffs' counsel simply stated, without more, "we have every reason to believe" that, at a minimum, Marquette University would reinstate its men's wrestling team on a privately funded basis if at least the first prong of the Three Part Test were struck down. Tr. Hr'g 10/15/02 at 119.

Plaintiffs also argue that defendant greatly exaggerates the degree of "likelihood" of redress required to establish Article III standing. Pl.'s Opp'n at 12. However, as pointed out by defendant, the cases relied upon by plaintiffs are inapposite. *See* Def.'s Reply at 5, n. 2. For instance, plaintiffs cite to this Court's opinion in *Allbaugh* for the proposition that "when a challenged agency action authorizes allegedly illegal activity that will almost surely harm a person, that person has standing to make a claim." *Bldg. & Constr. Trades Dep't, AFL–CIO v. Allbaugh,* 172 F.Supp.2d at 147. However, in *Allbaugh,* the challenged agency action, an Executive Order strictly prohibiting certain conduct on the part of executive agencies awarding construction contracts, directly led the agencies in question to rescind labor agreements previously negotiated with plaintiffs, as well as to reject future agreements of the type prohibited. *Id.* at 143–45. Prior to making the statement relied upon by plaintiffs, this Court noted that the plaintiffs in *Allbaugh* had lost the benefit of a particular agreement previously negotiated with a government agency subject to the Executive Order, were precluded from attempting to negotiate such agreements with government agencies in the future, or both. *Id.* at 147–48.

*Allbaugh* is therefore readily distinguished from this case. *Allbaugh* involved a regulation which directly prohibited an

agency from taking a particular course of action, which, in turn, directly affected the plaintiffs in particularized ways. *See id.* at 155 ("the causal chain . . . is clear: [the Executive Order] prohibits federal agencies from including PLAs in the bid specifications or other contract documents for federally owned projects."). Moreover, at least one of the contracting agencies had specifically represented that it would enter into the type of agreement prohibited by the Executive Order if the Order were struck down. *Id.* at 150–51. Once preliminary injunctive relief was granted, it proceeded to do precisely that. *Id.* at 151. Conversely, under Title IX as enforced by DoE, educational institutions select from a range of options when choosing how to comply with the statute and its regulations while meeting their academic and athletic goals with limited resources. *See, e.g. Cohen II,* 101 F.3d at 185 (institutions may achieve compliance with Title IX by eliminating athletic programs altogether, elevating or creating the number of women's athletic opportunities, demoting or eliminating the number of men's opportunities, or a combination of remedies; institutional priorities will determine the path to compliance elected by an institution); *see Allbaugh,* 172 F.Supp.2d at 155 ("[The Executive Order] does not present federal agencies with a choice; rather it directly prohibits federal agencies from including PLAs in their bid specifications.").

Flexibility, as well as First Amendment considerations embodied within the notion of academic freedom, are central to the Title IX statutory and regulatory framework. *See, e.g. Cohen II,* 101 F.3d at 187; *Kelley v. Bd. of Tr.,* 35 F.3d at 271; *Williams v. Sch. Dist. of Bethlehem,* 998 F.2d at 171 ("the provisions of title IX grant flexibility to the recipient of federal funds to organize its athletic program as it wishes, so long as the goal of equal athletic opportunity is met."). Educational institutions selecting athletic offerings exercise discretion within a complex regulatory scheme which requires consideration of a multitude of factors beyond the effective accommodation of the interests and abilities of members of both sexes, the regulatory factor under which the Three Part Test is applied. *See* 34 C.F.R. § 106.41(c); *see also Cohen II,* 101 F.3d at 171 ("In short, the substantial proportionality test is but one aspect of the inquiry into whether an institution's athletics program complies with Title IX."). These include, among others, distribution of facilities, coaching, and scholarship resources among teams, male and female, scheduling of practice time and games, and the competitiveness of various teams. *See* 34 C.F.R. § 106.41(c); *see also* 34 C.F.R. § 106.37(c)(institutions "must provide reasonable opportunities for such award [of financial assistance] for members of each sex in proportion to the number of students of each sex participating in intercollegiate athletics."). Furthermore, factors external to the regulatory scheme come into play in athletic program decision-making, including the desire to achieve a particular competitive level, availability of athletes with high school competition experience, and spectator interest.[17] *See, e.g.,*

---

**17.** Plaintiffs ask this Court to take financial considerations out of the chain of causation because, at least with respect to Bucknell, Marquette, and Yale, private funding to sustain the men's wrestling program is available or has been offered. *See* Tr. Hr'g 10/15/02 at 118–19. However, it is noteworthy that, in a recent decision, the Eighth Circuit held that a public university cannot avoid its legal obligations by substituting funds from private sources for funds from tax revenues. Once a university receives a monetary donation, the funds become public money, subject to Title IX's legal obligations in their disbursement. . . .

*Kelley v. Bd. of Tr.*, 35 F.3d at 269 (men's swimming selected for termination because, "among other things, the program was historically weak, swimming is not a widely offered athletic activity in high schools, and it does not have a large spectator following."). While plaintiffs are not required to eliminate every other potential cause of their injury, it cannot be held, as it was in *Allbaugh*, that the Three Part Test and 1996 Clarification, which address a single aspect of this complex algebra, so controls the conduct of third parties as to confer standing on plaintiffs. *See Allbaugh*, 172 F.Supp.2d at 149 ("While indirect causation is possible, the Supreme Court has yet to define the precise parameters for determining when indirect causation is sufficient for standing purposes. Each court faced with such a question must determine how much 'coercion' is sufficient to hold that the government's action caused a third party's action to injure plaintiff.").

Similarly, while plaintiffs need not prove that the requested relief is certain to alleviate the harm alleged, particularly in the context of a complex regulatory scheme governing the conduct of third parties, they must produce at least some evidence that the immediate result of striking down the contested regulations would be a reduction in the harm alleged. *See Cmty. Nutrition Inst. v. Block*, 698 F.2d 1239, 1248–49 (C.A.D.C.1983) *rev'd* on other grounds, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). It is particularly relevant in this regard that there have been no representations on the part of any of the specific educational institutions whose con-

duct is the subject of plaintiffs' allegations that the teams cut would be reinstated should this Court grant plaintiffs the relief they seek. *Compare Competitive Enter. Inst. v. Nat'l Hwy. Traffic Safety Admin.*, 901 F.2d at 114–18 (major auto manufacturers stated on the record that, in the absence of challenged standards, they would make efforts to regain market share by producing larger vehicles, "[t]he administrative record [was] replete with evidence that manufacturers face consumer demand for larger vehicles," agency's own fact finding demonstrated causal effect between regulation of fuel efficiency and availability of larger and heavier vehicles, and past experience demonstrated that manufacturers were likely to respond to lower standards by continuing or expanding production of larger, heavier vehicles); *Cmty. Nutrition Inst. v. Block*, 698 F.2d at 1248 (plaintiffs cited to U.S. Dept. of Agriculture Impact Statement predicting that elimination of regulatory requirement would result in savings to consumer plaintiffs); *Bldg & Constr. Trades Dep't, AFL–CIO v. Allbaugh*, 172 F.Supp.2d at 150–51 (at least one of contracting agencies had represented that it would take action eliminating alleged harm if challenged regulation was struck down, and did so upon grant of preliminary injunction). Plaintiffs' failure to offer more specific and concrete allegations suggesting a "substantial likelihood" that invalidation of the challenged policy interpretations would change third party educational institutions' conduct in such a way as to alleviate their alleged harm renders their reliance on *Allbaugh* misplaced.

*Chalenor v. Univ. of N.D.*, 291 F.3d at 1048. Moreover, universities have "no obligation to accept the donation." *Id.* Therefore, plaintiffs' assertions that "but for Title IX," Bucknell, Marquette, and Yale would not have cut their men's wrestling teams because funding was available to sustain them are by no

means water-tight. Nevertheless, the Court has, as required by the governing case law, made all favorable inferences in favor of the plaintiffs, and has not relied on funding considerations in its analysis of causation and redressability.

Plaintiffs also rely on the D.C. Circuit's opinion in *Northeast Energy Associates v. FERC* to support their assertion of standing. *Northeast Energy Associates v. FERC,* 158 F.3d 150, 151, 153–54 (D.C.Cir. 1998). There, the court found that rate payers had standing to challenge agency action allowing a regulated third party to charge plaintiffs a prescribed rate for the transport of natural gas during a specific period of time. *Id.* However, under the relevant statute, the agency, the Federal Energy Regulatory Commission ("FERC"), must approve the rates charged by natural gas pipeline operators. *Id.* at 151. Therefore, as was the case in *Allbaugh,* the agency exercised complete control over the relevant third party conduct.

Moreover, the *FERC* court noted that, on the facts before it, plaintiffs' relief did not depend entirely on the conduct of third parties. *Id.* at 153. Because the agency effectively controlled the maximum rate natural gas providers could charge plaintiffs, it could have taken direct action which would have provided plaintiffs the relief sought, simply by requiring the third party to charge plaintiffs lower rates during the relevant time period. *Id.* Therefore, the Circuit found that remand to the agency for new rulemaking could in fact lead directly to redress of plaintiffs' harm without relying on a third party's discretionary decision-making, because the agency might choose, on remand, to reverse its decision to suspend the operation of lower rates for five months. *Id.* at 154.

Here, there is no direct action DoE could take in new rulemaking which would force educational institutions to redress plaintiffs' alleged injuries. Even if DoE were to adopt an interpretation of the statute and the 1975 Regulations reflecting all of plaintiffs' desires, and completely withdraw federal funds pursuant to 20 U.S.C. § 1682 from educational institutions engaging in cutting and "capping" men's teams, the institutions in question could still conceivably persist in the conduct complained of if motivated by other considerations. *See Freedom Republicans,* 13 F.3d at 419; *see also* NWLC Brief at 15 (some men's teams could still be cut in order to accommodate other men's teams rather than to accommodate women's teams). While withdrawal of all federal funding to an institution is a powerful enforcement tool, it does allow the funded entity to elect to proceed with discriminatory conduct in the absence of federal funding without punitive repercussions. As such, it is an enforcement mechanism substantially different from the regulations implicated in the cases relied upon by plaintiffs, which directly permit and prohibit conduct, and subject a regulated third party to civil or criminal enforcement actions for noncompliance.

The case cited by plaintiffs which comes closest to supporting a finding that plaintiffs have alleged facts sufficient to survive a motion to dismiss for failure to meet the redressability prong of the standing test falls far short of doing so. *Motor & Eq't Man. Ass'n v. Nichols* involved a challenge brought by manufacturers of car parts to an EPA regulation permitting auto manufacturers to comply with federal auto-emissions standards by instead complying with California emissions standards. *Motor & Eq't Man. Ass'n v. Nichols,* 142 F.3d 449, 452 (D.C.Cir.1998). Plaintiffs in that case contended that manufacturers' statutorily authorized election to comply with the California standards as opposed to the federal standards decreased the market for their parts because compliance with California standards made their parts more difficult to install. *Id.* Defendants challenged plaintiffs' standing on the grounds that auto manufacturers made independent decisions with respect to which standard to comply

with, and therefore repeal of the challenged rule would not necessarily affect the decisions of these "third parties not before the Court." *Id.* at 457.

However, the Circuit found in *Nichols* that the challenged rule had indisputably resulted in a virtually unanimous decision by auto manufacturers to comply with California standards rather than federal standards. *Id.* As a result, the "tremendous incentive" created by the challenged rule for third parties to engage in conduct harmful to the plaintiffs left "no doubt" in the Circuit's mind that "the unfettered choices made by independent actors [had] been ... made in such a manner as to produce causation." *Id.* (citing *Lujan*, 504 U.S. 555, 112 S.Ct. 2130). Accordingly, a court order vacating the challenged rule and ordering the agency to undertake a new rulemaking could remedy plaintiffs' alleged injuries, and a declaration by the court that the challenged agency regulation was unlawful under the Clean Air Act would render redress of plaintiff's injury more likely at the agency level. *Id.* If the agency engaged in rulemaking consistent with the Circuit's opinion, manufacturers would be barred from complying with the California standard, and would have no choice but to comply with the federal standard.

Conversely, plaintiffs in this case have alleged no such virtually unanimous decision on the part of educational institutions to comply with the challenged Title IX enforcement scheme by cutting or capping men's teams or otherwise disadvantaging male athletes and coaches. Indeed, *amici* NWLC *et al* cite to numerous instances in which educational institutions have been found to be in compliance with the Three Part Test without cutting or capping men's

teams in order to comply with the first prong of the Three Part Test. *See* NWLC Brief at 11 ("the actual operation of the three-part test has demonstrated that the great majority of schools have expanded opportunities for men as well as women in complying with its requirements") (citing *NCAA 1982–2001 Sports Sponsorship and Participation Statistics Report* (2002)). In fact, *amici* NWLC point to a recent GAO study which indicates that the number of men's teams has increased overall since 1982, including at schools which added women's teams. *Id.* at 12 (citing *Intercollegiate Athletics: Four–Year Colleges' Experiences Adding and Discontinuing Teams* (2001)).

Moreover, funded educational institutions have cut and capped men's teams while increasing women's athletic opportunities during periods when the Three Part Test was not enforced. *See* NWLC Brief at 12 ("[i]n [a] four year period when the three-part test was not in effect, colleges and universities cut wrestling teams at a rate almost three times as high as the rate of decline during the 12 years after Title IX's application to intercollegiate programs was firmly reestablished ...") (citing *NCAA 1982–2001 Sports Sponsorship and Participation Statistics Report* (2002)); *see also Competitive Enter. Inst. v. Nat'l Hwy. Traffic Safety Admin.*, 901 F.2d at 117 (relying in part on past history of third party conduct in response to regulatory changes). These historical patterns lend further support to the proposition that multiple considerations in addition to, and beyond compliance with, the challenged interpretation of Title IX, inform the decisions of educational institutions, including Bucknell and Marquette, to cut men's wrestling teams.[18] Conditions un-

---

18. *See* Bucknell News Release, May 2, 2001, stating that decision to cut men's wrestling team was made not only to comply with Title

IX, but also in an effort to "retain excellence in our existing sports programs, and be fiscally responsible." *See also* Marquette News

der which the Three Part Test plays no role whatsoever in causing the alleged harm to plaintiffs, and in which striking down the challenged interpretations would have no effect, are therefore entirely plausible.

Plaintiffs respond, and *amici* NWLC *et al.* concede, that men's athletic opportunities have not increased at the same rate as women's over the time period during which the Three Part Test has been enforced. *See* NWLC Brief at 11 (rate of increase in women's athletic opportunities has been higher). Plaintiffs further contend that the disproportionate increase in women's opportunities reflects intentional discrimination against men authorized by the second and third prongs of the Three Part Test. However, as NWLC correctly points out, any disproportionate increase in women's athletic opportunities could just as easily be the result of institutions' non-discriminatory efforts to accommodate women's growing interest in athletics. *See* NWLC Brief at 8. At most, plaintiffs allege that at "some" institutions men's interest is greater than women's, but nevertheless women's interests are being more fully accommodated than men's as a result of efforts to comply with the second and third prongs of the Three Part Test. Pl.'s Opp'n at 3 n. 4, 9; Tr. Hr'g 10/15/02 at 119 ("there are some schools in the United States, and this is what we said in the complaint, where men are more interested than women or we assume that's the case ... at least at those schools there's an argument that men are more interested than women ... men are put essentially on an unequal footing.") Such generalized

and conclusory allegations, accompanied by vague references to overall decreases in men's athletic opportunities and increases in women's opportunities, are insufficient to establish either causation or redressability with respect to the second and third prongs.

As a result, plaintiffs' First Amended Complaint falls far short of alleging a uniform discriminatory response arising from educational institutions' efforts to comply with at least one of the three prongs of the Three Part Test. While an educational institution's exercise of discretion may indeed be limited to selection among three options for demonstrating equal athletic opportunity, plaintiffs have not established causation or redressability under the case law cited with respect to any one of the three prongs of the Three Part Test.

Moreover, as pointed out by defendant, educational institutions, unlike automobile manufacturers, do not require authorization from a government agency to engage in the conduct giving rise to plaintiffs' action. Def.'s Reply at 5 n. 2. Therefore, this case is distinguishable from those in which vacating government action would render a third party's conduct illegal, thereby effectively preventing third parties from engaging in the conduct alleged to cause harm. *See* Def.'s Mot. at 16. Even assuming *arguendo* that all three prongs of the Three Part Test are a substantial cause, for standing purposes, of plaintiffs' injuries, and that the relief requested by plaintiffs were to be granted in its entirety, under the Title IX statutory and regulatory framework, institutions

---

Release, June 17, 2001, citing "the financial and competitive environment," as well as compliance with Title IX, as justifications for cutting men's wrestling team.

Additionally, it has been suggested that men's sports such as wrestling are just as likely to be cut because of disproportionate

consumption of resources by other men's sports, such as football and basketball. *See* NWLC Brief at 15. Under such circumstances, plaintiffs' alleged injuries could be addressed without offending the Three Part Test by reapportioning resources within men's athletic departments. *Id.*

could elect to forgo federal funding and still engage in intentional discrimination against men's teams based on considerations other than the Three Part Test.[19] *See* Tr. Hr'g 10/15/02 at 48 (plaintiffs' counsel concedes that, even if plaintiffs were granted all of the relief they seek, they would be limited to seeking termination of funding to institutions which persist in conduct they complain of). Accordingly, plaintiffs' reliance on cases in which a Court Order would have the effect of rendering the challenged conduct illegal are misplaced.[20]

Plaintiffs' citation to this Circuit's decision in *Tozzi* is equally unavailing. Plaintiffs have not met their burden of alleging facts sufficient to establish that "agency action is at least a substantial factor motivating the third parties' actions." Pl.'s Opp'n at 11, citing *Tozzi v. U.S. Dep't of Health & Human Serv,* 271 F.3d 301, 308 (D.C.Cir.2001). In *Tozzi,* the agency action challenged was the issuance of a report intended to serve as the federal government's "authoritative state of knowledge regarding the carcinogenicity of various chemicals," and as a resource for federal, state, and local regulatory authorities. *Id.* at 309. The record established that it was an extremely influential document with respect to which substances the federal government considered appropriately labeled with the "inherently pejorative and damaging term... 'carcinogen.'" *Id.* at 309. Plaintiffs were manufacturers of products

**19.** This Court has previously rejected a bright line rule providing that a third party's decision regarding whether or not to comply with a federal pronouncement is *"necessarily* a voluntary and independent action of a third party because there is no sanction beyond the threatened loss of funding." *Allbaugh,* 172 F.Supp.2d at 151. In so doing, it noted that conditional funding can "cause" a third party recipient's decisions for standing purposes where it has the effect of coercing or determining the third party's conduct. *See id.* at 152. The *Allbaugh* opinion ultimately held that no speculation as to causation is required where "plaintiffs can prove to the requisite standard of proof that [a third party's] decision was actually caused by the federal government's threat to cease funding, and only by that threat." *Id.* at 150. However, as discussed above, considerations beyond compliance with Title IX and continued receipt of federal funding motivate the decisions of funded educational institutions regarding their athletic programs. As a result, plaintiffs have failed to meet the standard for establishing causation based on conditional funding set forth in *Allbaugh. See also Freedom Republicans,* 13 F.3d at 419 ("we would be venturing into pure speculation were we to attempt to foretell [third party] response to termination of its present funding.").

**20.** Equally problematic is plaintiffs' subsequent reliance on the D.C. Circuit's holding in *Animal Legal Def. Fund v. Glickman* as supporting a finding of redressability. *See Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d 426 (D.C.Cir.1998) (en banc); Tr. Hr'g 10/15/02 at 114; Pl.'s Reply in Supp. of Mot. for Leave to File Second Am. Compl. at 2. As in *Motor & Eq't Man. Ass'n v. Nichols,* the challenged agency action in *Animal Legal Def. Fund* directly prohibited or permitted particular conduct on the part of the third party. The consequences of non-compliance with agency regulations went beyond funding cuts. *Animal Legal Def. Fund, Inc. v. Glickman,* 154 F.3d at 439 ("If the USDA had found the Game Farm out of compliance with current regulations, or if the governing regulations had themselves been more stringent, the Game Farm's owners would have been forced (in order to remain in accord with the law) to either alter their practices or go out of business and transfer their animals to exhibitors willing to operate legally") It was in that context that the Circuit held a plaintiff's injuries to be redressable where challenged agency action authorizes otherwise illegal conduct. *Id.* at 440–41. In this case, even if plaintiffs' contention that the 1979 Policy Interpretation and 1996 Clarification authorize conduct that is otherwise "illegal" under Title IX is accepted as true, third parties could still lawfully elect to engage in such conduct, albeit without the benefit of federal funding.

known to release the substance the report characterized as "a known human carcinogen." *Tozzi v. U.S. Dept. Of Health and Human Serv.*, 271 F.3d at 307. Moreover, 95 percent of the company's sales depended on the continued use of their product by "the medical establishment." *Id.* As a result, the D.C. Circuit found that it was "not too speculative to conclude that the Report will injure [plaintiffs] economically, even with the presence of other causal factors." *Id.* at 309. In light of the absence of any other authoritative federal government pronouncement describing the substance in question as a "known carcinogen," the Circuit also found that plaintiffs' alleged injury could be redressed by a court order declaring the report's findings to be without sufficient scientific basis. *Id.* at 309–10.

The 1979 Policy Interpretation and 1996 Clarification are concededly authoritative statements by a federal government agency regarding the means by which educational institutions may comply with Title IX. And, the facts at issue in both *Tozzi* and this case differ substantially from the circumstances before the courts in *Allbaugh, FERC,* and *Motor & Eq't Man. Ass'n,* in which the third parties whose conduct was alleged to be the cause of plaintiffs' harm were subject to the direct control of the agency whose actions were challenged.

However, the similarities between this case and *Tozzi* go no further. In *Tozzi,* the responses of state and local regulatory agencies, as well as private purchasers, to the challenged agency action were both entirely predictable and direct. *See Tozzi*

*v. U.S. Dept. Of Health and Human Serv.,* 271 F.3d at 307 ("When the government attaches an inherently pejorative and damaging term such as 'carcinogen' to a product, the probability of economic harm increases exponentially."); *see also Block v. Meese,* 793 F.2d 1303, 1309 (D.C.Cir.1986) (public's irrational reaction to government agency's branding of films as "propaganda" did not preclude finding that alleged harm was "fairly traceable" to government conduct). The influence of other causal factors paled in comparison to the likely effects of an authoritative governmental declaration that a product intended for a medical market released a "known human carcinogen." The relationship between the existence of the challenged regulatory interpretation and the injuries alleged by plaintiffs here is far more attenuated. Compliance with other aspects of the 1975 Regulations, financial considerations, staffing, availability of facilities, spectator interest, and competitiveness are but a few of the equally compelling considerations factoring into decisions made by educational institutions regarding their athletic programs.

On the facts alleged in the First Amended Complaint, the Three Part Test cannot be singled out as a "substantial factor" motivating the decisions of educational institutions, with the possible exception of Bucknell University's decision to cut its men's wrestling team.[21] Plaintiffs argue that an allegation that any school actually elected to cut or cap a men's team in an effort to comply with the first part of the Three Part Test is sufficient for purposes of causation, thereby rendering plaintiffs' allegations with respect to Bucknell sufficient to establish standing in this case.

---

21. First Am. Compl. ¶¶ 50–52. The First Amended Complaint alleges with respect to Marquette University's decision only that it was made in an effort to comply with DoE's "Title IX policies." First Am. Compl. ¶ 51.

Similarly, plaintiffs allege only that Yale University demoted its varsity wrestling team to "club status" and refused to accept a private endowment to sustain the team "because of Title IX." *Id.* ¶ 52.

However, unlike the plaintiff in *Tozzi*, even with respect to Bucknell, plaintiffs cannot point, in support of their claim of redressability, to the absence of other causal factors of equal or greater weight in third party decision-making processes.[22]

Nor have plaintiffs alleged, with respect to redressability, that Bucknell has any intention of restoring its men's wrestling team should the Three Part Test be struck down, thereby removing this case from the reach of the *Allbaugh* and *Competitive Enter. Institute* holdings. As for Marquette University's men's wrestling team, a statement by Marquette's athletic director indicating "that Marquette might bring back its wrestling program if the legal requirements change" is insufficient to support a finding that redressability has been established. *See* First Am. Compl. ¶¶ 50, 51. To the contrary, it seems to confirm that educational institutions engage in multi-factor analysis with respect to athletic offerings, in which compliance with the Three Part Test is but one consideration among many, rather than responding predictably to a direct regulatory prohibition or permission. While a party "need not show to a certainty that a favorable decision will redress his injury," plaintiffs have not established, on the allegations of their complaint, even a "mere likelihood" that repeal of the Three Part Test will result in reinstatement of men's varsity wrestling at either Bucknell or Marquette. *See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C.Cir.1988).

Nor does plaintiffs' allegation that "one third of institutions acknowledged cutting teams to comply with gender equity goals or requirements" establish that an Order of this Court striking down the Three Part Test and declaring "gender-conscious cutting and capping" unlawful would be "substantially likely" to lead these same educational institutions to make different decisions. First Am. Compl. ¶ 48. It goes without saying that plaintiffs' allegations "on information and belief" that Yale refused to accept a private endowment to support its varsity wrestling team "because of Title IX" is insufficient to establish causation or redressability for standing purposes.

Finally, plaintiffs contend that this Circuit found in *Women's Equity Action League v. Cavazos* that "identically situated plaintiffs" had standing to bring an action against DoE's predecessor, HEW, to redress injuries under Title IX. *See Women's Equity Action League v. Cavazos*, 879 F.2d 880, 884–88 (D.C.Cir.1989) [hereinafter "WEAL I"]. It bears emphasizing that plaintiffs in this case are not "identically situated" to those in *WEAL I*, notwithstanding their claim that they too seek enforcement of Title IX's proscription against intentional discrimination based on sex through repeal of an agency interpretation of the statute which they contend authorizes, and even requires, intentional discrimination against men. *See WEAL I*, 879 F.2d at 884 (women's organizations charged that the federal government disbursed federal funds to institutions engaged in discrimination based on sex, thereby assisting in the perpetuation of discrimination against plaintiffs). First and foremost, plaintiffs here are not, as were plaintiffs in *WEAL I*, challenging DoE's decision to provide federal funding

---

**22.** As noted above, the Bucknell press release on which plaintiffs rely cites to considerations beyond compliance with the Three Part Test as pertinent to Bucknell's decision to cut the men's wrestling program. *See* Bucknell News Release, May 2, 2001 (stating that deci-sion to cut men's wrestling team was made not only to comply with Title IX, but also in an effort to "retain excellence in our existing sports programs, and be fiscally responsible.")

to the educational institutions they allege are engaging in discriminatory conduct. *See Women's Equity Action League v. Cavazos*, 906 F.2d 742, 747 (D.C.Cir.1990) ("WEAL II") ("Authorization to sue the federal government in a situation-specific suit for improperly funding a particular entity or enterprise, however, is not equivalent to a permit to demand across-the-board judicial supervision of continuing federal agency enforcement.").

Secondly, the *WEAL I* opinion noted that "[p]laintiffs in this action, beyond question, are the intended beneficiaries of the statute under which they sue." *Id.* at 886. Conversely, several courts have noted that Title IX "focuses on opportunities for the underrepresented gender, and does not bestow rights on the historically overrepresented gender." *Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d at 615; *see also Cohen II*, 101 F.3d at 175. As one court observed, although Title IX and its regulations apply equally to men and women, "it would require blinders to ignore that the motivation for the promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Cohen II*, 101 F.3d at 175 (quoting *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d at 175). "It is women and not men who have historically and continue to be underrepresented in sports ... at universities nationwide." *Cohen II*, 101 F.3d at 175.

Moreover, the D.C. Circuit has more recently limited the *WEAL I* holding to its facts.[23] *Freedom Republicans v. FEC*, 13 F.3d at 417–18. In so doing, the Circuit

noted that the *WEAL I* panel's rationale for finding redressability had been "undercut substantially" by the U.S. Supreme Court decision in *Lujan*, which held that "[w]hen plaintiffs' asserted injury stems from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, the 'fairly traceable' and redressability prongs require more exacting scrutiny." *Freedom Republicans v. FEC*, 13 F.3d at 416, 417 (citing *Lujan*, 504 U.S. 555, 112 S.Ct. 2130). The *Freedom Republicans* opinion also emphasized the "formidable evidence" in support of redressability adduced in *WEAL I*. *Id.* at 418. In applying the level of scrutiny to plaintiffs' assertion of standing required by current U.S. Supreme Court and D.C. Circuit precedent, this Court cannot but conclude that plaintiffs' assertion of standing based on that of their student athlete and coach members fails on causation and redressability grounds, for the reasons outlined above.

The allegations plaintiffs seek to add through the proposed Second Amended Complaint do not alter this result. Plaintiff NWCA can no more establish standing as an organization than its members can. In fact, plaintiffs' allegation that NWCA is directly harmed by the Three Part Test because institutional compliance results in decreased membership is one more step removed from agency action in the chain of causation than the injuries alleged by its student athlete and coach members. *See* Second Am. Compl. ¶ 4, Tocci Decl. ¶¶ 5,6. Plaintiffs' members represent additional third parties whose independent and discretionary decisions to maintain or cancel their membership when men's wrestling teams are cut or capped are beyond the

---

**23.** It is also worth noting that the D.C. Circuit subsequently held in *WEAL II* that, in light of intervening authority, the plaintiffs in that case could not sustain a cause of action against a federal funding agency while by-

passing funding recipients. *See WEAL II*, 906 F.2d at 747–750. However, the Circuit came to this conclusion on statutory, rather than standing, grounds.

control of this Court. *See Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1387. NWCA's allegation that "[a]fter a high school, college, or university cuts its wrestling team, it generally does not renew its membership in future years" is certainly not sufficient to persuade this Court that the choices of these third parties "have been or will be made in such a manner as to produce causation and permit redressability of injury." *See Lujan,* 504 U.S. at 562, 112 S.Ct. 2130; *see also Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1387 ("Significantly, the amended complaint contains no allegation that the NCAA has lost a single member ... on account of the HEW regulations."). Accordingly, if causation and redressability cannot be established for plaintiff NWCA's student athlete and coach members, there is no basis for a finding that it has been established with respect to NWCA as an organization.

Nor does plaintiffs' allegation that NWCA includes among its members "federally funded colleges, universities, high schools, and associations of high schools that are directly affected by the Title IX rules challenged in this action" correct defects in plaintiffs' assertion of standing. To the extent that such institutions claim that they serve as unwitting tools of discrimination based on sex, they, as well as the coaches that plaintiff associations count among their members, appear to be limited to asserting third party standing on behalf of student athletes. *See Lutheran Church–Missouri Synod v. FCC,* 141 F.3d at 350, *Fraternal Order of Police v. United States,* 152 F.3d at 1002. In light of this Court's finding that student-athletes' assertion of standing fails on causation and redressability grounds, this claim on behalf of plaintiffs' coach and institutional members must also fail.

To the extent that plaintiffs assert some other direct injury to their members who are federally funded educational institutions, they have failed to do so with any specificity whatsoever. Plaintiffs make no specific allegations whatsoever regarding the effects of the 1979 Policy Interpretation and 1996 Clarification on the only two institutional members named in the proposed Second Amended Complaint and its accompanying declarations, Muhlenberg College and Northwestern University, or for any other institutional member for that matter. Plaintiffs also fail to allege any injury to Northwestern University as an institution arising from its negotiation of a settlement agreement with DoE requiring compliance with the first prong of the Three Part Test beyond the "forced instrument of discrimination" injury discussed above. And, most notably, plaintiffs do not allege that Bucknell University, Marquette University, or Yale University, the institutions with respect to which they have made their most specific allegations regarding the impacts of the challenged regulatory interpretations, are members of any plaintiff association.

Plaintiffs contend that, at the motion to dismiss phase, they need not plead facts with the same specificity as at the summary judgment phase. Pl.'s Opp'n at 6, citing *Nat'l Wildlife Fed'n v. Burford,* 835 F.2d 305, 311–312 (D.C.Cir.1987). Specifically, plaintiffs argue, relying on this Circuit's decision in *Nat'l Wildlife Fed'n v. Burford,* that they need not, at the motion to dismiss stage, identify a specific member who is affected by agency action. It is true that the Circuit held in *Burford* that, where a plaintiff "asserts particularized, discrete injuries to its members as persons who regularly use areas affected by the Program for specific activities and pastimes," there is no authority requiring that it allege precisely which members use which specific areas of land subject to chal-

lenged agency action. *Nat'l Wildlife Fed'n v. Burford,* 835 F.2d at 313. However, this holding does not go so far as to authorize the type of allegations, or lack thereof, plaintiffs seek to rely upon here as a basis for standing. Moreover, plaintiffs fail to mention that in *Burford,* the plaintiffs had appended to their Complaint a list of 778 specific actions taken by the agency with respect to particular pieces of land, thereby providing sufficient specificity regarding the injuries alleged and the agency's role in causing them.

No such degree of specificity is present here. Plaintiffs ask this Court to accept their allegations that DoE has initiated investigations and enforcement actions, and negotiated settlement agreements relying on the 1979 Policy Interpretation and the 1996 Clarification, some of which have involved plaintiffs' institutional members, as sufficient to establish the three elements of Article III standing. Second Am. Compl. ¶¶ 58–60. Even under the liberal pleading requirements at the motion to dismiss stage, such a reading of controlling precedent is strained.

Nevertheless, as discussed below, even if the Court assumes Muhlenberg and Northwestern's standing to challenge the 1979 Policy Interpretation and the 1996 Clarification based on their status as regulated entities, plaintiffs cannot meet the third prong of the associational standing test with respect to these members. *See Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1388–1391 (finding that plaintiffs' college members had standing, as regulated parties, to challenge HEW's Title IX regulations relating to athletics).

### 2. *Associational Standing*

Before plaintiffs' associational standing can be premised on that of its institutional members, the Court must consider the remaining two prongs of the associational standing test. While it is undisputed that the interests plaintiffs seek to protect are germane to their organizational purpose,[24] it is also clear that the relief requested requires the participation of individual NWCA's institutional members. *See* Fed. R.Civ.P. 19;[25] *Fund Democracy, LLC v. SEC,* 278 F.3d at 25; *Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1391–92.

■ For instance, insofar as plaintiffs challenge the validity of the settlement agreement entered into between its mem-

---

**24.** *See Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.,* 901 F.2d 107, 111 (D.C.Cir.1990) ("Germaneness is satisfied by a "mere pertinence" between litigation subject and an organization's purpose.").

**25.** Rule 19(a) of the Federal Rules of Civil Procedure provides for the joinder, if feasible, of a party if, in the party's absence "complete relief cannot be accorded among those already parties," or the party "claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest ...." Fed.R.Civ.P. 19(a). If a party described in Rule 19(a) cannot be joined in the action, under Rule 19(b) the Court is required to determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." Fed.R.Civ.P. 19(b). The Court must consider the following factors when making this determination:

(1) "to what extent a judgment rendered in the person's absence might be prejudicial to the person or to those already parties;"
(2) "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;"
(3) "whether a judgment rendered in the person's absence will be adequate;"
(4) "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

ber Northwestern University and DoE as an application of the 1979 Policy Interpretation's Three Part Test and the 1996 Clarification, Northwestern is an indispensable party to such an action. *See* Fed.R.Civ.P. 19(b); *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 788 (D.C.Cir. 1983). "Numerous cases hold that 'an action seeking recision of a contract must be dismissed unless all parties to the contract, and others having a substantial interest in it, can be joined.'" *Naartex Consulting Corp. v. Watt,* 722 F.2d at 788. Because plaintiffs have alleged no basis for this Court to assert personal jurisdiction over Northwestern University, to the extent that plaintiffs enjoy standing based on a challenge to the manner in which the 1979 Policy Interpretation and 1996 Clarification were applied to Northwestern University so as to give rise to the settlement agreement, their claim must be dismissed for failure to join an indispensable party under Fed.R.Civ.P. 19(b).[26] This analysis applies with equal or greater force to plaintiffs' more generalized allegations of injury to its institutional members, including Muhlenberg College. *See* Tr. Hr'g 10/15/02.

█ Plaintiffs respond that they do not seek to challenge compliance agreements entered into between DoE and its member institutions. Pl.'s Reply to Def.'s Supp. Mem. At 8. Rather, plaintiffs now allege that they "seek to establish a continuing

violation of Title IX and the APA through ... ongoing enforcement of *ultra vires* rules." *Id.* Nevertheless, because plaintiffs have failed to specify precisely how they believe enforcement of the 1979 Policy Interpretation and 1996 Clarification injures their educational institution members, as distinct from their individual members, or even suggest that the majority of their institutional members support their position with respect to DoE's promulgation and enforcement of these regulatory interpretations, the Court cannot but conclude that the presence of those institutions in this action is required to both assert and protect their interests. *See* Fed.R.Civ.P. 19(b); *Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1391 ("when an association does not have standing in its own right, and it is not clear on which side of the lawsuit the association's members would agree with, one or more of the members must openly declare their support of the association stance, and they must do so through those officials authorized to bring suit on their behalf.").

For the reasons set forth above, this Court holds that plaintiffs do not have standing under Article III of the U.S. Constitution to assert their claims under Counts I and II. It further holds that the additional allegations plaintiffs seek to make in the proposed Second Amended Complaint do not cure jurisdictional defects, and therefore are futile.[27] Accord-

---

26. Plaintiffs urge that, because the question of whether NWCA's member schools would appear voluntarily in this action if the Court found them to be indispensable has not been addressed by the parties, the Court should deny the motion to dismiss and permit discovery. In view of the fact that plaintiffs have had ample opportunity to seek the voluntary participation of their member schools in this action, and have provided the Court with no reason to believe that discovery is necessary to enable them to secure such participation, plaintiffs' recommendation is without merit.

27. It bears emphasis that this Court has afforded plaintiffs a generous presumption that they are acting in good faith in moving for leave to file a Second Amended Complaint seeking to amend allegations regarding their own membership at this late date. Defendant correctly points out that, when plaintiffs filed this suit in January of 2002, plaintiff NWCA was "not-for-profit corporation representing the interests of collegiate and scholastic wrestling coaches." Def.'s Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl. at 1–2; Compl. ¶ 4. In May of the same year, plaintiffs

ingly, it need proceed no further with respect to those claims.

■ This Court's finding that these particular plaintiffs do not have standing to assert the claims in Counts I and II neither places the challenged agency actions beyond judicial review nor denies plaintiffs a forum in which to seek relief. Regulated entities, including plaintiffs' educational institution members, are empowered to challenge DoE's regulations and interpretations thereof, provided they meet the "case or controversy" requirements of Article III and Fed.R.Civ.P. 19 is satisfied. *See, e.g., N. Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 102 S.Ct. 1912, 72 L.Ed.2d 299; *Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d at 1388–1391; *Romeo Cmty. Schs. v. U.S. Dept. of H.E.W.,* 600 F.2d 581. Additionally, Title IX itself expressly provides for a cause of action by any institution denied funding under the statute, through which the institution could challenge the agency's authority to adopt the policy interpretations at issue here, or the manner in which they are applied to that particular institution. *See* 20 U.S.C. § 1683 ("In the case of an action . . . terminating or refusing to grant or continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 1682 of this title, any person aggrieved . . . may obtain judicial review of such action . . . ."). Accordingly, any of plaintiffs' member institutions who wish to challenge a specific enforcement action by DoE against them are free to do so, either directly under Title IX or under the APA.

■ An implied right of action against funded educational institutions clearly exists for plaintiffs, as representatives of their individual members, to challenge a funded entity's conduct under the regulations. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560. Plaintiffs are free to argue in such an action that the agency's interpretation of the statute and its regulations, as embodied in the 1979 Policy Interpretation and 1996 Clarification, are not entitled to deference under the APA or *Chevron,* but rather should be struck down as unconstitutional or contrary to Title IX.

The Sixth Circuit's decision in *Miami Univ.* does not, as plaintiffs contend preclude such actions. Rather, it simply requires that plaintiffs directly challenge DoE regulations and policy interpretations followed by a funded entity when they challenge conduct by an educational institution taken in conformity with those agency pronouncements. *Miami Univ. Wrestling Club v. Miami Univ.,* 302 F.3d at 614; *see also Kelley v. Bd. of Tr.,* 35 F.3d at 272.

Nor does the U.S. Supreme Court's opinion in *Alexander v. Sandoval* preclude plaintiffs from challenging the agency interpretations they seek to vacate here. *See Alexander v. Sandoval* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

essentially reiterated this understanding of NWCA's membership in their First Amended Complaint. Def.'s Opp'n to Pl.'s Mot. for Leave to File Second Am. Compl. at 1; First Am. Compl. ¶ 4. Immediately on the heels of oral argument on defendant's motion to dismiss, plaintiffs sought to amend their complaint yet again, this time to make substantial and material changes to their allegations regarding plaintiff NWCA's membership, which it now contends includes a much broader array of constituents, even though they did not know "with the requisite certainty" that these members were among NWCA's number a mere five months before. *See* Pl.'s Mem. in Support of Mot. for Leave to File Second Am. Compl. at 1. To say the least, plaintiffs' assertions strain credulity. Nevertheless, this Court, has, as required to by controlling authority, made all reasonable inferences in favor of plaintiffs in adjudicating defendant's motion to dismiss.

Plaintiffs' arguments to the contrary are contradictory to say the least. While, on the one hand, plaintiffs ask this Court to vacate the agency's "disparate impact" "rules," in the next breath they claim that they are without means to challenge the agency's interpretations of the statute and regulations because *Sandoval* precludes them from bringing a "disparate impact" action to enforce Title IX. *See Alexander v. Sandoval,* 532 U.S. 275, 285, 121 S.Ct. 1511 (private right of action to enforce Title VI does not include a private right to enforce "disparate impact regulations."); Tr. Hr'g 10/15/02 at 37, 40, 74. Such circular and self-serving arguments cannot possibly form a solid basis for standing. This Court finds that, whatever the status of plaintiffs' potential ability to *enforce* the policies they challenge here, they are certainly free to *challenge* them by means of an action against a funded entity conducting itself in accordance with them, so long as they raise facial statutory and constitutional challenges to the 1979 Policy Interpretation and 1996 Clarification.

Accordingly, plaintiffs and their individual and institutional members are not without standing to challenge the agency conduct at issue in any forum. Rather, they simply have not made allegations sufficient to support their standing to assert the claims they wish to make under Counts I and II of the First Amended Complaint against this defendant.

## COUNT III—DENIAL OF PETITION

The APA requires each agency to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). Judicial review of an agency's grant or denial of a petition made pursuant to § 553(e) is available, although the scope of review is "very narrow" and deferential, and the agency's decision must be sustained if it "violates no

law, is blessed with an articulated justification that makes a rational connection between the facts and the choice made, and follows upon a 'hard look' by the agency at the relevant issues." *Natural Res. Def. Council, Inc. v. S.E.C.,* 606 F.2d 1031, 1039 (D.C.Cir.1979) (citation omitted); *see also Am. Horse Prot. Ass'n, Inc. v. Lyng,* 812 F.2d 1, 5 (D.C.Cir.1987); *WWHT v. FCC,* 656 F.2d 807, 816–18 (D.C.Cir.1981).

█ Plaintiffs contend that, by letter dated October 25, 1995, plaintiff NWCA submitted a 5 U.S.C. § 553(e) petition for amendment or repeal of the Three Part Test, on the grounds that "the test violates the rights of male athletes under Title IX and the Constitution," and on the basis of "changed circumstances between the 1970s and the 1990s." First Am. Compl. ¶¶ 74, 75. Plaintiffs further allege that DoE expressly and summarily denied their petition in the final 1996 Clarification, and that such denial represented "final agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law." *Id.* at ¶¶ 76, 77. Assuming plaintiffs' allegations to be true, as we must, an improper denial of a petition brought under 5 U.S.C. § 553(e) constitutes a concrete and particularized injury, directly caused by the agency to which the petition was addressed, and redressable by this Court through remand to the agency for proper consideration of the petition. Accordingly, plaintiffs have standing under Article III to pursue this claim.

## COUNT IV—ABDICATION

█ In Count IV of their complaint, plaintiffs allege that DoE abdicated its responsibility to enforce Title IX's prohibition against discrimination based on sex by promoting and approving institutional conduct under the Three Part Test which discriminates against men. Pl.'s Opp'n at 17.

Plaintiffs' so-called "abdication claim," fails not for lack of standing, but for failure to state a claim. In *Washington Legal Foundation,* cited by plaintiffs in support of their claim, the D.C. Circuit held that, on the facts before it, which are akin to those before this Court, there was no basis for finding that a direct action against the agency under an "abdication theory" was available under the APA. *Wash. Legal Found. v. Alexander,* 984 F.2d 483, 487–88 (D.C.Cir.1993) (*dist'ing Adams v. Richardson,* 480 F.2d 1159 (C.A.D.C.1973) ("Thus, unlike *Adams,* this case does not involve an injunction requiring an agency to 'enforce its own determination that educational institutions have discriminated in violation of Title VI.' Accordingly, assuming without deciding that an *Adams* abdication action might still be available under the APA after our decision in *WEAL,* such an action is not available to the appellants in this case.")) Here, as in *Wash. Legal Foundation,* there has been no allegation by plaintiffs that DoE has found any federally funded institution to be in violation of Title IX and has subsequently failed to act to enforce its own determination for some policy reason challenged by plaintiff. *See id.* at 488. As a result, plaintiffs' effort to characterize their challenge as one to a "conscious policy of non-enforcement" is unavailing. *See* Tr. Hr'g 10/15/02 at 42.

Moreover, even if plaintiffs' contention that the 1979 Policy Interpretation and the 1996 Clarification represent a "consciously and expressly adopted," documented, written policy "abdicating ... statutory responsibilities" to enforce Title IX's prohibition against sex discrimination, plaintiffs cannot establish Article III standing for the reasons articulated at length with respect to Counts I and II. *See* Tr. Hr'g 10/15/02 at 42. Whether the agency's alleged crime is one of affirmative action or omission, plaintiffs cannot make the requisite showings of causation, redressability, and associational standing.

## COUNTS V, VI, VII—PROCEDURAL DEFECTS

 With respect to the claims made in Counts V through VII, raising allegations of procedural defects in the promulgation of the 1979 Policy Interpretation and 1996 Clarification, defendant correctly argues that the "injury-in-fact" requirement of the Article III standing test cannot be met by merely alleging that the government violated the law or a procedural requirement. Def.'s Mot. at 13, *citing Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 82 L.Ed.2d 556, (1984) ("[t]his Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court."); *Fund Democracy,* 278 F.3d at 27 ("The mere violation of a procedural requirement does not authorize all persons to sue to enforce the requirement. A party has standing to challenge an agency's failure to abide by a procedural requirement only if the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.").

Therefore, the only injury claimed by plaintiffs which this Court can consider for the purposes of standing analysis is the elimination of intercollegiate men's sports opportunities and teams, specifically men's wrestling teams, resulting from educational institutions' efforts to comply with Title IX. And, for the reasons set forth in the portions of this opinion addressing Counts I and II, plaintiffs have not met the Article III standing requirements.

## C. Merits
### COUNT III

While Count III is the only claim for which plaintiffs have made a threshold

showing of Article III standing, it is clear on the record before this Court that the allegations relating to Count III are insufficient to confer jurisdiction on this Court.

■ Plaintiffs' reliance on this section of the Administrative Procedure Act as conferring jurisdiction on this Court to hear their claims is misplaced for several reasons. First and foremost, Section 553, by its terms, does not apply "to interpretive rules, general statements of policy, or rules of agency organization, procedure or practice" unless notice or hearing is required by statute. 5 U.S.C. § 553(e). Plaintiffs concede that the 1979 Policy Interpretation and proposed 1996 Clarification challenged in their October 1995 submission are "interpretive rules." Tr. Hr'g 10/15/02 at 52 ("Yeah, they're interpretive rules, I think both of them, both interpreting the regulation.").

Moreover, plaintiffs ask this Court to construe plaintiff NWCA's response to the proposed 1996 Clarification as a petition to amend or repeal. However, such a construction would be strained to say the least. Defendant clearly points out that plaintiff's October 1995 letter did not expressly ask DoE to amend or repeal its interpretive rules or the 1975 Regulations. It was clearly filed in response to the draft of the 1996 Clarification, for which the letter of transmittal made abundantly clear that DoE did not intend, by soliciting comments on the sufficiency of the *clarification* provided, to revisit the substance of the 1979 Policy Interpretation and the Three Part Test. *See* Tr. Hr'g 10/15/02 at 35; *see also Edison Elec. Inst. v. Interstate Commerce Comm'n,* 969 F.2d at 1230 (refusing to construe a substantive comment as a petition for rescission, noting that "barring extreme arbitrariness," courts defer to the agency's decisions regarding their own dockets); *Henley v. FDA,* 873 F.Supp. 776, 780 (E.D.N.Y.1995)

(noting agency's acknowledgment of receipt of petition and assignment of docket number); *Wisconsin Elec. Power Co. v. Costle,* 715 F.2d 323, 325 (7th Cir.1983) (noting that agency itself construed plaintiffs' submission as a petition made pursuant to 5 U.S.C. § 553(e)); *Nader v. Nuclear Regulatory Comm'n,* 513 F.2d 1045, 1049, 1051 (D.C.Cir.1975) (same).

Plaintiffs appear to concede as much given a recently filed, and presumably procedurally proper, petition to amend or repeal. *See* Pl.'s Jan. 16, 2003 Notice of Petition. To the Court's knowledge, the agency has, as of yet, taken no action on the recently filed petition. Therefore, the question of whether a denial of this most recent petition would confer jurisdiction on the Court is not yet ripe. *See id.; Edison Elec. Inst. v. Interstate Commerce Comm'n,* 969 F.2d at 1230.

■ Finally, even if the Court were to construe plaintiff NWCA's submission during the 1996 Clarification process as a petition which was denied by defendant, plaintiffs would still not be entitled to the relief they are seeking, namely an Order of this Court requiring the defendant to embark on a new rulemaking process. The appropriate remedy where an agency's response to a petition is found to be deficient is "remand for further explanation or reconsideration, not a mandate to promulgate the requested rule." *Henley v. FDA,* 873 F.Supp. at 786; *WWHT v. FCC,* 656 F.2d at 818, 819 ("Administrative rule making does not ordinarily comprehend any rights in private parties to compel an agency to institute such proceedings or promulgate rules," but "an agency may be forced by a reviewing court to institute rulemaking proceedings if a significant factual predicate of a prior decision on the subject has been removed.") (citations omitted).

## V. CONCLUSION

"Concerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so." *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991). Before entertaining claims which contemplate taking the dramatic step of striking down a landmark civil rights statute's regulatory enforcement scheme, the Court must take pains to ensure that the parties and allegations before it are such that the issues will be fully and fairly litigated. This is particularly true where the challenged enforcement scheme is one which has benefitted from more than twenty years of study, critical examination, and judicial review, and for which a demonstrated need continues to be recognized by the nation's legislators. In the Court's view, plaintiffs have failed to meet their burden of persuasion on the question of whether they are the proper parties to be asserting the claims they raise against the defendant.

Plaintiffs' general reference in their First Amended Complaint to "hundreds of enforcement actions" initiated by DoE across the nation, absent further allegations with respect to circumstances giving rise to such actions, does not establish a factual record before the Court that is sufficiently particularized to adjudicate plaintiffs' claims. Neither do plaintiffs' conclusory allegations that such enforcement actions have led to negotiated settlements with educational institutions which have reduced athletic participation opportunities for men, absent any further enunciation of the terms and implementation of those agreements. Nor does plaintiffs' allegation, proposed in the Second Amended Complaint, that NWCA member Northwestern University entered into one such settlement agreement, with harmful consequences to its members, correct this deficiency, given the complete absence of any specific allegations of harm to Northwestern University, its staff, or its students.

Finally, even if plaintiffs' assertions that their educational institution members, such as Northwestern University, are harmed by the challenged policies are accepted at face value, this is not a case where "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *See Warth v. Seldin,* 422 U.S. at 515, 95 S.Ct. 2197. Accordingly, at a minimum, this is one of those unusual cases for which the presence of an association's members is necessary for the Court's proper exercise of jurisdiction over the claims asserted.

The critical importance of the protections offered by Title IX, the significant flexibility built into the DoE's enforcement scheme, and the multiplicity of considerations beyond Title IX which influence educational institutions' athletic decision-making are such that courts cannot take a cavalier approach to the critical question of which parties have standing to challenge enforcement policies promulgated pursuant to the statute. Rather, the core principles of standing doctrine require the Court to exercise particular caution in adjudicating standing questions where the actions and interests of third parties not before the Court are implicated. Plaintiffs' allegations and arguments have fallen far short of what is required to establish standing under the circumstances presented.

Accordingly, for the reasons set forth herein, this Court is without jurisdiction to consider plaintiffs' claims against the DoE. Defendant's motion to dismiss for lack of jurisdiction is therefore **GRANTED** as to all but Count III. Further, defendant's motion to dismiss for failure to state a claim is hereby **GRANTED** with respect

to Count III. Plaintiffs' action is therefore dismissed in its entirety. An appropriate Order accompanies this Memorandum Opinion.